No. 84,042

STATE OF KANSAS, *Appellee*, v. VAUGHN L. FLOURNOY, *Appellant.*
(36 P.3d 273)

■■■■

Opinion filed December 14, 2001.

*Janine Cox*, assistant appellate defender, argued the cause, and *Jennifer C. Roth*, assistant appellate defender, and *Jessica R. Kunen*, chief appellate defender, were with her on the brief for appellant.

*Sheryl L. Lidtke*, assistant district attorney, argued the cause, and *Nick A. Tomasic*, district attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

SIX, J.: Defendant Vaughn Flournoy appeals his convictions for first-degree premeditated murder of his grandmother, Lillian Thomas, and battery of his girlfriend, Cheryl Key. K.S.A. 21-3401(a); K.S.A. 2000 Supp. 21-3412. The district court imposed a hard 40 sentence, finding that the murder was a crime committed for the purpose of receiving money or other thing of monetary value and was committed in an especially heinous, atrocious, or cruel manner. K.S.A. 21-4636(c), (f). One mitigating circumstance, no significant history of prior criminal activity, was found. See K.S.A. 21-4637(a).

Our jurisdiction is under K.S.A. 22-3601(b)(1) (an appeal of a conviction resulting in an off-grid crime receives review by this court).

The issues for review, besides claims of error in imposing the hard 40 sentence and prosecutorial misconduct during closing argument, are whether the district court erred by: (1) admitting a witness' preliminary hearing transcript into evidence, (2) allowing testimony reciting excerpts from Flournoy's diary, (3) permitting rebuttal testimony regarding Flournoy's statements and tests performed during a competency exam, and (4) failing to instruct the jury on Flournoy's theory of defense.

We affirm Flournoy's convictions, finding no reversible error. However, we find insufficient evidence to support the K.S.A. 21-4636(f) aggravating circumstance (heinous, atrocious, or cruel), vacate the hard 40 sentence, and remand for resentencing.

## FACTS

On the morning of November 26, 1997, Flournoy walked into the Kansas City, Kansas, Police Department and turned himself in for killing his grandmother Lillian Thomas. Detective Clyde Blood took Flournoy's statement. Blood said Flournoy was "nervous, obviously, but cooperative the whole time." Flournoy could not remember everything that happened, saying, "[M]y wife had told me the other night I snapped, I killed my grandmother. . . . I told them I just wanted to know if it was true. If it's true I'm here. If it's not, I'm sorry for wasting your time." Lab tests showed that Flournoy's blood contained Benzoylecgonine, which is metabolized cocaine, and caffeine. Forensic pathologist Dr. Eric Mitchell

testified that Thomas suffered two gunshot wounds in the hairline of her scalp, one in her right front chest, one in her left front chest, and one on her right arm forearm. Dr. Mitchell said the shooter was 2 or 3 feet away from Thomas when the shots were fired. All of the shots except the wound to the arm could have been fatal, and all shots most likely took place in less than 1 minute.

During Flournoy's interview, the police asked him why he hurt Thomas. He said, "She was going off on my wife [girlfriend Cheryl Key] and then I know nothing else." He said that he and Key were upstairs talking. He was feeling "unstable," and they were discussing his feelings. Flournoy said Thomas called them downstairs and "started yelling how stupid and ignorant" Flournoy and Key were. The next thing he remembered was slamming into a dumpster in Thomas' car.

Flournoy said he used Thomas' .38 mm revolver, but he did not remember how he got the gun. He could not remember how many times he shot Thomas, how far he was from her when he shot her, what part of her body he fired at, or what he had done with the gun. The gun was not found. Flournoy testified at trial.

### Flournoy's Trial Testimony

Flournoy explained that after age 12, he had lived with his grandparents for most of his life. He moved out of his mother's house because her boyfriends beat and molested his sister. He joined the U.S. Navy after high school graduation and served 3 years, eventually returning to live with his grandparents. He had migraines and blackouts in the past. His first wife and Key had both told him about blackouts he had suffered. He was told that he had punched a hole in the wall of his house, and once he attacked Key's brother who had threatened him. The blackouts were brought on by "stress" and "arguments." He tried to commit suicide twice in 1996.

Around May 1996, Flournoy worked 12-hour shifts at a casino and was stressed out. He "felt like [he] was losing control." His mother took him to the Kansas University Medical Center, where he stayed for 12 hours. He kept a diary in which he wrote: "The same ole story of family freaking out on each other and me coming

home in time to get cussed out and put out. This time the rage took over and I decided to get help or kill her [Thomas]." After leaving the medical center, he went to the City Union Mission for the Christian Life Program, where he met Key, who worked there as a cook. Flournoy apparently told Thomas that he would get counseling.

Regarding the day of the attacks, Flournoy testified that he remembered walking with Key and then the next thing he knew, he was getting up off the ground, and Key was telling him that he had attacked Thomas. He testified that Thomas yelled at him and told him that one day someone was going to blow his brains out, and she "started going off on Cheryl again." Flournoy went into the kitchen. He testified that this was the last thing he remembered. Later, he walked with Key from a hotel to a bus stop and then bought beer and cocaine. Then next morning, he went to the police station.

## Key's Testimony

Key testified at the preliminary hearing. After the district court found her unavailable at trial, her preliminary hearing testimony was read into evidence. She had known Flournoy for 2 years and was his girlfriend. On the weekend of November 22, 1997, she stayed with Flournoy at Thomas' house. On Monday, November 24, she and Flournoy went to the public library, where he looked for a book on "demonology." Flournoy told Key that his mother introduced him to demonology when he was 9 years old and that he practiced it on his own for 9 years. They returned to Thomas' house, watched television, shared a beer, and played cards.

Later that day, Flournoy and Key went shopping. While they were walking, Flournoy suddenly grabbed Key, lifted her off the ground, threw her down, and punched her all over, leaving both eyes black. After he stopped, the police arrived. Key did not press charges. Key and Flournoy returned to the house.

After the incident, Key said that Thomas told her that she (Key) did not deserve "to be hit" and "was better than that." Then Flournoy joined them, and the three talked for awhile. After Key went upstairs, she overheard Flournoy ask Thomas about "Sister Rickie."

She heard Thomas say that she did not know what he was talking about and to "get out of my face with that mess." Key thought Sister Rickie was a pastor at a church, but she did not know which one.

As Flournoy came upstairs, he told Key, "She [Thomas] tells me f—— my mother and then she tells me love my mother." Then, he dropped down on his knees in front of Key and grabbed her shirt, saying "[P]lease tell me about your God, please tell me about your God." Key said she pointed to a Bible and said, "Read your Bible." He then lit a cigar and sat cross-legged on the floor. Thomas started calling him, but he did not move. She asked him if he heard Thomas, and he said, "Yes," but he did not move. He just stared straight ahead. When asked by defense counsel if Flournoy appeared to be in a trance, Key said, "Yes."

Key went back downstairs to talk to Thomas. Thomas eventually hollered for Flournoy again. He came downstairs, and Thomas "started fussing at him" and asked why he and Key were fighting. Flournoy asked her what she was talking about. A few minutes later, he called out to Key in a "tone of voice . . . so different." Key saw Flournoy standing by the kitchen sink with a knife in his hand. In a loud voice, Key told Flournoy to put down the knife.

Key sat in the living room in a chair next to Thomas, and Flournoy sat at the kitchen table. After a while, Thomas "started hollering at [Flournoy] again" for about 45 minutes to an hour. Thomas said Flournoy needed to get his life together and that he could not be a good husband for Key. Key said that Flournoy came into the living room with a gun in his right hand, with his arm at his side. She jumped up, stood in front of him, and said, "Don't do that, put that up." Flournoy did not say anything.

He raised the gun over Key's shoulder and pulled the trigger. After the first shot, Key told him to stop and ran into the kitchen. Flournoy said, "I have to put her out of her misery." Key heard two or three shots. Then, Flournoy played with Thomas' hair and "talked to her like she was still there." He told Key to go upstairs and get her purse and jacket. He showed her a small knife and said, "I'm going to take this with me, and . . . when the police

catch me I'm going to shoot myself and I want to be buried with my knife."

Flournoy went through Thomas' bedrooms and threw things around for the next 30 minutes. He took a drawer of pennies, a file box, and a jewelry box. He told Key to give the file box to a specific attorney, but Key could not remember the attorney's name. They left the house and walked to the car. Flournoy said, "Oh, I lost mamma's [Thomas] keys. . . . Mamma is going to be pissed I lost her keys and I can't find them." He broke one car window with a hand weight, but then he realized he had the keys. They drove around the block and returned to the house. They stayed a few minutes and then drove around Kansas and Missouri for 5 or 6 hours. Flournoy stopped at a gas station, 2 or 3 banks, and a friend's house in an attempt to exchange the pennies for paper currency.

Flournoy did not start talking to Key until several hours into their drive. She asked him if he remembered what he did and told him that he needed to turn himself in. She said Flournoy looked "kind of puzzled" and said he did not remember.

When Key told Flournoy what had happened, he said he would turn himself in, but first he wanted to watch the news to see what was going on. They checked into a hotel, and then Key went home on a bus. Flournoy said he would let her leave because she had kids that needed her.

## DISCUSSION

### The Hard 40 Sentence

We first take up Flournoy's assertion that the district court erred by imposing a hard 40 sentence. K.S.A. 21-4635; K.S.A. 21-4636. He argues that there was insufficient evidence to support the aggravating circumstances upon which the district court relied. We agree with Flournoy's argument as it applies to 21-4636(f), the "especially heinous, atrocious or cruel manner" aggravating circumstance.

Our standard of review under K.S.A. 21-4636 is whether, after viewing all the evidence in the light most favorable to the prosecution, a rational factfinder could have found the existence of the

aggravating circumstance by a preponderance of the evidence. *State v. Murillo*, 269 Kan. 281, 287-88, 7 P.3d 264 (2000).

K.S.A. 21-4636 lists the aggravating circumstances that shall be considered. The district court found that two aggravating circumstances existed. The crime was committed (1) to receive money or any other thing of monetary value and (2) in an especially heinous, atrocious, or cruel manner. See K.S.A. 21-4636(c), (f). The district court reasoned that following the murder, Flournoy took "many valuables from the house" and attempted to sell some of the items to obtain money for himself. The district court also found one mitigating circumstance because Flournoy had no significant history of prior criminal activity. See K.S.A. 21-4637(a).

Flournoy looks to four of our cases in which we held that the defendant committed a crime for the purpose of receiving money or something of value. He argues that those cases are distinguishable from his case. See *Murillo*, 269 Kan. at 289 (Murillo committed murder while attempting to find cocaine.); *State v. Vontress*, 266 Kan. 248, 249, 970 P.2d 42 (1998) (Vontress and another man went to the victim's house "looking for drugs and money."); *State v. Cromwell*, 253 Kan. 495, 513, 856 P.2d 1299, modified by *State v. Willis*, 254 Kan. 119, 864 P.2d 1198 (1993) (one victim's purse and one victim's billfold and checkbook were missing); *State v. Kingsley*, 252 Kan. 761, 764, 851 P.2d 370 (1993) (Kingsley testified that he and his wife went to the victim's house to "knock her out, tie her up, and take her money.")

Key testified that Flournoy took a number of items out of the house and put them in the car. Officers at the scene noted that dresser drawers had been pulled out and items thrown around. Some of the bedrooms appeared to be "ransacked," like someone was looking for something. The file box that Flournoy gave to Key contained significant financial information and several savings bonds. Flournoy stopped at a friend's house and at several local banks attempting to cash the stolen pennies. Also, evidence showed that if Flournoy was exonerated for the murder, he stood to be the executor of Thomas' estate. Flournoy's sister testified that Flournoy "knew he was going to get everything." She said just before Thomas' death, Thomas had told Flournoy that she was going to

remove him from the will as the executor, and he responded that he was going to get the house anyway.

We conclude that there was sufficient evidence to show that the murder was committed for the purpose of receiving money or any other thing of monetary value.

We now turn to K.S.A. 21-4636(f), the heinous, atrocious, or cruel circumstance. The district judge said:

> "I believe it is more heinous and more atrocious when it is done by an individual against someone who has provided them a lot of love, affection and care over the time of their life. That is much more atrocious and heinous in my view than it would be had you killed someone in a card game or for any other reason, out on the street, perhaps someone you didn't know. To me, that is very atrocious and very heinous. I might also add that it appears to me that you were very intent on accomplishing the end results here, that was the death of your grandmother. You shot her twice and after a few seconds you shot her again in order . . . 'to put her out of her misery.' That was the testimony. This wasn't a case where you got very mad and one shot was fired . . . out of a gun and it hit your grandmother. There were four shots into her body. You intended to kill her, you did kill her. And she had provided a lot of love, care and affection for you over the term of your thirty-two years of life. That makes this as a special heinous, atrocious and cruel crime."

The State argues that the relationship of Flournoy and Thomas was relevant in analyzing the manner in which the murder took place. The State concedes, however, that the biological relationship alone cannot serve as a basis for a hard 40 sentence. This contradiction advanced by the State to support its position is puzzling.

Flournoy counters that it was irrelevant that the victim was his grandmother. He cites *State v. Follin*, 263 Kan. 28, 947 P.2d 8 (1997), where Follin, a father, was convicted of the stabbing deaths of his 3-and 4-year-old daughters. The State seemed to suggest that the "tender ages of the victims contribute[d] to the atrocious manner in which the murders were committed." 263 Kan. at 51. We commented that the plain language of the statute did not support such a suggestion. We said: "The focus is on defendant's conduct, on his actions as he killed the victims. It is not on the nature of the victim." 263 Kan. at 51. In holding that the killings were not "especially heinous, atrocious, or cruel," we said: "Follin's conduct [was] more susceptible to being interpreted as the perpetrator's

avoiding infliction of serious anguish or physical abuse before the victim's death." 263 Kan. at 51.

We have said: "All murders are heinous, atrocious, and cruel. The legislature, by using the phrase 'in [an especially] heinous, atrocious, or cruel manner,' meant that the heinous, atrocious, or cruel manner must be in a special or unusual degree, to an extent greater than in other cases." *State v. Cook*, 259 Kan. 370, 403, 913 P.2d 97 (1996). Shooting deaths are generally not considered committed in an especially heinous, atrocious, or cruel manner. *State v. Conley*, 270 Kan. 18, 28, 11 P.3d 1147 (2000), *cert. denied* 532 U.S. 932 (2001).

We recognized an exception to the rule in *State v. Alford*, 257 Kan. 830, 838, 896 P.2d 1059 (1995). We found that the *Alford* facts supported a finding that the murder was heinous and cruel. Alford entered a Burger King kitchen waving his gun. He chased the victim into the lobby of the restaurant and shot her twice. He forced the victim back into the kitchen, and when she attempted to escape, he shot her again. Finally, he dragged her around the corner of the kitchen and continually tried to fire the jammed gun. After a long series of attempts to fire the gun, Alford fired the final two shots. 257 Kan. at 838.

In *State v. Brady*, 261 Kan. 109, 123, 929 P.2d 132 (1996), a shooting death case, we also upheld a hard 40 sentence (abrogation of the hard 40 beyond a reasonable doubt standard of review recognized in *Vontress*, 266 Kan. at 258). Both victims in *Brady* were forced to lie face down on the floor for 15 minutes not knowing what would happen, while Brady paced the room holding the gun.

In *Cook*, 259 Kan. 370, the victim was found in his bed. The coroner testified that the victim was shot once in the chest and once in the back. The district court imposed a hard 40 sentence after a jury found that Cook killed the victim in a particularly heinous, atrocious, or cruel manner. On appeal, we held that post-death mutilation could not be considered an aggravating circumstance. 259 Kan. at 401. Regarding the gunshots, we looked to the exceptional circumstances in *Alford*. In *Cook*, the State contended that based on his wounds, the victim either faced Cook and turned away to avoid being shot, or was shot in the back and turned to see

who shot him. We concluded that a rational factfinder could not find that the shooting was committed in a special or unusual degree or to an extent greater than in other cases; thus, Cook's hard 40 sentence was inappropriate. 259 Kan. at 403.

The testimony here, when construed in a manner favorable to the State, was that Flournoy came into the living room with a gun in his right hand, with his arm at his side. Key, seeing only the tip of the gun, jumped out of her chair and stood in front of Flournoy, telling him, "[D]on't do that, put that up." When asked if Thomas saw the gun, Key said, "I'm sure she did." Neither Thomas nor Flournoy said anything. Flournoy stood in front of Key and fired the gun over her shoulder. After the first shot, Key ran to the kitchen and told Flournoy to stop. He said, "I have to put her out of her misery" and fired again. Key testified that Flournoy called her out to the living room and asked her to sit in the chair next to Thomas. She heard a "kind of . . . grunting noise" from Thomas. A forensic pathologist testified that Thomas suffered five gunshot wounds. All of the shots most likely occurred in less than 1 minute.

Unlike the victims in *Alford* and *Brady*, Thomas was not chased down, nor forced to lie on the floor awaiting death. The shooting took place within 1 minute. As in *Cook,* we conclude the evidence does not support a finding that the murder was committed in an especially heinous, atrocious, or cruel manner.

With the elimination of the "heinous and cruel" aggravating circumstance, our inquiry shifts to the balance between the remaining aggravating circumstance of receiving money or something of value with the mitigating circumstance of no significant history of prior criminal activity.

The combination of aggravating and mitigating circumstances here does not produce the overwhelming disparity presented in *State v. Bailey,* 251 Kan. 156, 174, 177-78, 834 P.2d 342 (1992) (Forensic evidence established major trauma to all parts of the victim's body. No estimate of how many times victim had been stomped upon. Blood in multiple locations established a lengthy period of assault and a slow death.) See also *State v. Livingston,* No. 86,230, decided this date. (19 blows, primarily to the skull of the victim, with a claw hammer;) *State v. Brown,* No. 84,606, de-

cided this date (eight or nine blows with a claw hammer). With one of Flournoy's aggravating circumstances removed from the balance, the circumstances must be reweighed. Such reweighing must be done by the district court. K.S.A. 21-4635(c). *State v. Coleman,* 271 Kan. 733, 742, 26 P.3d 613, (2001); *State v. Spain,* 263 Kan. 708, 725, 953 P.2d 1004 (1998). We vacate the hard 40 sentence and remand to the district court for reweighing of the one remaining aggravating circumstance and the mitigating circumstance.

### Prosecutorial Misconduct During Closing Arguments

Flournoy contends that he was deprived of his constitutional right to a fair trial by the prosecutor's misconduct during closing argument.

Flournoy acknowledges that he made no objection to the prosecutor's comments at trial. Generally, we do not apply the plain error rule, and reversible error normally cannot be predicated upon a complaint of prosecutorial misconduct during closing argument where no contemporaneous objection is lodged. *State v. Gould,* 271 Kan. 394, 403, 23 P.3d 801 (2001). See K.S.A. 60-261 (harmless error); *State v. Holmes,* 272 Kan. 491, 498, 33 P.3d 856, 861 (2001) ("The Kansas harmless error statute encompasses the federal harmless error and plain error rules.") The prosecutor's remarks here do not rise to the level of violating either Flournoy's right to a fair trial or his Fourteenth Amendment right to due process.

During closing arguments, the prosecutor said:

"She [Thomas] was frank about her opinion of what had happened, and he didn't like that. *But later on* [Thomas] *let it go.* She changed her clothes, she got out of her meeting clothes and . . . settled in for the evening. After eating supper that night, she watched a little bit of television, and later in the evening got herself a bowl of ice cream and a glass of water and sat down in her chair she normally sits in and settled in for a little late night television.

"*She let it go, but Vaughn wouldn't let it go.* . . .

"*And then sometime after midnight, Vaughn's anger finally reached his peak, after stewing for hours about it.* He went to the kitchen and he grabbed a butcher knife, and at that point he intended to do harm to his grandmother. But for the action of Cheryl Key, when she saw him, that alarmed her, she knew he wasn't just in there fixing something for dinner. They already had dinner. And his actions upset her so much that she got out of her chair and went in to talk to him out in

the kitchen and calmed him down; *and it wasn't Vaughn that put the knife back, it was Cheryl who put it back after a few minutes."* (Emphasis added.)

First, Flournoy argues that the evidence shows that Thomas did not "let it go"; rather, she kept talking or yelling at Flournoy.

The State asserts that a fair reading of the record shows that at the time of the murder, things had settled down in Thomas' mind. According to the State, the prosecutor merely drew from this evidence an inference that Thomas had "let it go" that evening and that Flournoy's actions showed he had not.

Second, Flournoy contends that the prosecutor misrepresented evidence regarding the knife in the kitchen when she said Key replaced the knife. The State concedes that Key testified that Flournoy put the knife away. The error about who put the knife away, had little, if any, likelihood of changing the result of the trial. See *State v. Finley,* 268 Kan. at 557, 571-72, 998 P.2d 95 (2000).

Third, Flournoy claims that the prosecutor improperly embellished what happened moments before the gun was fired. The prosecutor said:

"We know that she was sitting there watching television so she had to see him. *Imagine what's going through her mind as she sees her own grandson,* the one she has believed in for so many years *stand there with a loaded gun,* her own gun, looking at her with it. *We know that he must have killed her immediately or held her at gunpoint and threatened her not to move,* because she's still sitting in the same chair as she was in as she sat there and watched television. *Maybe she didn't have time to get up and run away or maybe just horror that is going through her mind, maybe the shock of it all paralyzed—all the fear paralyzed her. Did she plead with him, did she beg him not to do this? I guess only Vaughn would know that."* (Emphasis added.)

Flournoy explains that there was no evidence that he "held her at gunpoint and threatened her not to move," nor was there any evidence that Thomas pleaded with Flournoy. Key testified that Thomas said nothing and after the first shot Flournoy said he had to put her out of her misery.

Flournoy contends that these comments were inflammatory and invoked the emotions of the jury. Citing cases from other states, he reasons that it is improper for a prosecutor to state his or her personal beliefs regarding the victim's thoughts or to create an

emotional imaginary script. See *Urbin v. State*, 714 So.2d 411, 421 (Fla. 1988) (prosecutor went far beyond the evidence in emotionally creating an imaginary script demonstrating that the victim was shot while "pleading for his life"); *State v. Moore*, 81 Ohio St. 3d 22, 34, 689 N.E. 2d 1 (1998) (prosecutor's statements about victim's thoughts before death were improper).

The State points out that the prosecutor did not tell the jury that there was evidence of these actions. The State contends that the evidence supported such inferences. The State notes that Key said she was sure the victim noticed the gun before she died. The evidence showed that Thomas was shot to death while sitting in her chair. There was no evidence that she got up and ran to protect herself. In looking at the closing arguments surrounding the comments, it appears that the prosecutor was emphasizing the fact the Thomas remained in her chair.

The remarks concerning Thomas' thoughts were outside the scope of the evidence presented and, therefore, were improper. However, the error had little, if any, likelihood of changing the result of the trial. See *Finley*, 268 Kan. at 571-72.

Fourth, Flournoy argues that the prosecutor committed misconduct when she said, "[Thomas] raises her arm in probably self-defense, the gun being aimed at her, but her arm was no shield with that .38 Special. It went right through her arm." Dr. Mitchell, the forensic pathologist hypothesized that the bullet lodged in Thomas' right front chest may have traveled through her arm before hitting her chest. He could not say with certainty that Thomas had her arm or hand up during the shooting. As the State points out, the prosecutor's remark was based upon this evidence. There is no error.

Fifth, Flournoy takes issue with the following remarks made by the prosecutor:

"Vaughn is not a stupid person. Vaughn is a manipulator. Vaughn knows . . . how to say the right thing to manipulate the facts to benefit himself. He's a control freak, and he hates to be told what to do."

Flournoy argues that there is no evidence that he was a "manipulator" and "control freak." He contends that such comments were meant to inflame the jury.

The State counters that these were reasonable inferences, drawn from the physical evidence and testimony from the trial. It notes that Flournoy's mother agreed that he would say anything to save himself. Flournoy has shown no error in these remarks.

Sixth, Flournoy takes issue with the prosecutor's following comments:

*"Vaughn wasn't crazy when this happened. There are some people out there in this society who kill and he is one of those people. He did not have a mental defect. He has no mental disease. He's been evaluated, he's been trying to push this theory for a . . . long time. He actually has been evaluated twice at Larned, so he couldn't support his theory.* He doesn't have anything medically or psychologically wrong with him that would cause him not to remember what he did or not be able to form an intent to kill. He has nothing wrong with him physically, psychologically, medically that would prevent him from forming premeditation to kill someone. There are no problems that would cause him to have blackouts or this so-called problem he has, *he absolutely has no history of it even when he was in the military or otherwise. The only blackout he has ever had was from drinking too much.* . . . Why did he turn himself in? Well, maybe the guilt over it or maybe he thought he could get off on a lesser offense, maybe he thought you would all . . . believe the story, the diminished mental capacity."

Flournoy observes that he did not raise the defense of mental defect or diminished capacity. He also contends that the district court erred in admitting the testimony of two Larned State Hospital staff members, Dr. Fernando and Mr. Huerter. These questions are explored later in our opinion.

Regarding the "blackouts," the only evidence of Flournoy's experiencing them was his own testimony and that of Key concerning Flournoy's attack of her brother. It appears that by her comments, the prosecutor suggested that Flournoy did not suffer a blackout on the night of the murder. Flournoy shows no error.

Seventh, Flournoy takes issue with the prosecutor's following remarks:

"Now, this is a man that has been avoiding consequences all of his life for his actions. Blaming other people why he is the way he is. It's time now that this one final act of killing his grandmother he doesn't get away with. You all can find him accountable for his actions, he's not going to get away with his actions this time. You all must convict him of first degree premeditated murder."

Flournoy argues that the record does not show that he refuses to take responsibility for his actions. He observes that he went to the police station and confessed the crime, and he also supplied police with the keys to Thomas' house. He also gave Thomas' address and the only other witness' name and address. The State asserts that at trial Flournoy denied the charges against him. The record shows that Flournoy claimed to have blacked out and said he did not remember committing the murder. There is no error in the prosecutor's remark.

Finally, Flournoy asserts that the prosecutor erred by calling him a liar. The prosecutor agrees. We agree. Flournoy reasons that the error was compounded by the closing remarks. Here, the prosecutor's comments were improper. However, the closing remarks on this subject were brief and did not rise to the level of the comments in *State v. Pabst*, 268 Kan. 501, 507, 509, 996 P.2d 321 (2000) (noting the ultimate conclusion as to any witness' veracity rests with the jury). Considering the overwhelming evidence against Flournoy, the error had little, if any, likelihood of changing the result of the trial.

## The Preliminary Hearing Transcript

Flournoy next claims that the district court erred when it found that Key was unavailable as a witness. Over defense counsel's objection, Key's preliminary hearing transcript was used as evidence at trial. The district court's determination that a witness is unavailable to testify will not be disturbed on appeal absent an abuse of discretion. *State v. Love*, 267 Kan. 600, 609, 986 P.2d 358 (1999). K.S.A. 2000 Supp. 60-460(c)(2) allows "the use of preliminary hearing testimony in a trial of the same action if the declarant is unavailable at the trial and the adverse party had the right and opportunity to adequately cross-examine at the preliminary hearing." *State v. Zamora*, 263 Kan. 340, 342, 949 P.2d 621 (1997).

Under K.S.A. 60-459(g)(4) and (5), a witness may be unavailable when the witness is "absent beyond the jurisdiction of the court to compel appearance by its process" or "absent from the place of hearing because the proponent of his or her statement does not know and with diligence has been unable to ascertain his or her

whereabouts." The standard for determining whether a witness is unavailable is whether there has been a good faith effort to obtain the witness' presence at trial. The question of good faith effort turns on the totality of the facts and circumstances of the case. See *Zamora*, 263 Kan. at 342.

Flournoy's position is that Key's whereabouts were known; thus, the State did not use "reasonable diligence" in attempting to produce her for trial. During the trial, the prosecutor told the court that she had been unable to personally serve Key with a subpoena. The prosecutor moved the court for a finding of Key's unavailability in order to introduce the preliminary hearing transcript. The State presented testimony from two investigators from the district attorney's office. One testified that he first located Key in May 1998. He said the district attorney's office had trouble getting Key to appear at the preliminary hearing. At the time she lived in Kansas City, Missouri. Her family brought her in for the hearing. Because of the nature of this case, the investigator wrote down Key's date of birth, where she and family members lived, her social security number, and her place of employment. According to the investigator, for out-of-state witnesses such as Key, the district attorney's office often "[goes] through the out-of-state witness act to secure a witness," which is what the State did here.

In June 1999, two investigators attempted to find Key for the trial. One discovered that Key had moved and left no forwarding address. Key's mother had died, so the investigator checked with other agencies to see where Key might have been living. He discovered places that Key had worked and got an address on Belfontaine in Missouri where she was receiving unemployment checks. He went to that address. Key was not there, but a woman told him she would be back later. He left a card and a message for Key to call him. He was told that Key did not have a phone number. The next day, he returned to the house, and he could hear people talking inside, but nobody would answer the door. He also went to the last known address of Key's mother, but the house had been condemned by the city.

The investigators prepared out-of-state motions. A second investigator testified that he tried to locate Key and serve her with a

subpoena to testify at trial. He mailed subpoenas to three addresses, but two of the subpoenas were returned undeliverable. After out-of-state witness paperwork was filed, the chief investigator for the Jackson County, Missouri, District Attorney's office assisted in attempting to serve Key. A hearing was set in Jackson County, but investigators were unable to find her.

The second investigator went to Missouri to look for Key, going to four addresses. At the Belfontaine address he spoke to a young man who initially said Key did not live there, but then said that he knew her but did not know when she would be back. When the investigator returned to the house later that day, the front door was open, but when he started walking up the sidewalk, the front door slammed. He heard someone locking the door. He knocked, but nobody answered. The young man he had talked to earlier walked up to the front porch. He was "rude and guarded." The investigator left his card and a subpoena and asked the young man to give them to Key.

The investigator also learned that Key had been issued a new driver's license with the Belfontaine address on it. The investigator testified that the Missouri "SRS" gave him a phone number, which he called. He said the person who answered the phone was very "rude" and said they did not know Key and that she did not live there.

In addition, he also tried to track down Key's brother. During the investigation, he encountered someone who knew her brother, and this person asked him about Flournoy. He also found Key's cousin, who said he would try to contact Key. Later, the cousin told the investigator that Key did not want to be involved and "[t]hat's why she is hiding." Right before trial, the investigator stopped by the Belfontaine house another time and left a note and a subpoena with a young woman.

The State then asked that Key be found unavailable. Defense counsel proffered that he received a phone message from Key on June 18, 1999. He had received a "family telephone number" from Flournoy, which defense counsel called. The lady who answered asked who was calling and then said that Key was not there. Counsel called again and left a message on an answering machine that

had a greeting that said it was the "Key residence." When defense counsel did speak to Key on the phone, she told him that nobody had attempted to contact her and that she did not know anything about the trial. She also said she did not want to testify.

The district court, considering the totality of the circumstances, found that the State: (1) knew of Key's whereabouts in Missouri, which was beyond the jurisdiction of the court, (2) was unable to serve a subpoena upon her, and (3) made a good faith effort to find Key. The district court held the requirements of K.S.A. 2000 Supp. 60-460 and K.S.A. 60-459 had been met and admitted Key's preliminary hearing testimony.

Flournoy, relying on *State v. Cook*, 259 Kan. 370, 913 P.2d 97 (1996), *State v. Bey*, 217 Kan. 251, 535 P.2d 881 (1975), and *Zamora*, 263 Kan. 340, contends that the State failed to use "due diligence." We disagree. Flournoy claims that his case is distinguishable from *Cook* and *Zamora* because, here, the State "knew" where Key lived. He also points out that there was no evidence that Key had promised to testify at trial or that she was a willing and cooperative witness. During cross-examination at the preliminary hearing, Key admitted that she did not want to be there. Under the totality of the circumstances, we affirm the district court's finding of unavailability.

### The Diary

Flournoy asserts that the district court erred in allowing his mother, Vivian Shannon, to testify regarding an entry in his diary. He challenges the diary entry on the ground that it is more prejudicial than probative. He claims a violation of his right to a fair trial under the Fourteenth Amendment. The admission or exclusion of evidence is a matter of judicial discretion and should not be disturbed on appeal unless we find an abuse of discretion. *State v. Whitesell*, 270 Kan. 259, 276, 13 P.3d 887 (2000). We find no abuse here.

In June 1999, the State filed a notice of intent to introduce "prior conduct" of Flournoy involving a phone call and a diary either under K.S.A. 60-455 or independent thereof. The phone call was a three-way call between Flournoy, Vivian Shannon, and his aunt

Shiverla Shannon. During the conversation, Flournoy told Vivian to come and get him or he would kill Thomas. Flournoy did not object upon admission of Vivian's and Shiverla's testimony about the phone call. Later Vivian found the diary containing an entry that said Flournoy decided to get help or "kill her," meaning Thomas. The district court ruled that Vivian's and Shiverla's testimony regarding the phone call would be admissible. No ruling was made on the diary.

During trial, Detective Smith testified that he talked to Vivian about her finding the diary. Defense counsel objected, saying that the diary was highly prejudicial. The judge sustained the objection.

Later, during Vivian's testimony, the State again attempted to question her about the diary. Defense counsel objected. The judge said:

"Well, I've thought about this since the subject first came up a few days ago; and upon thinking about it, I'm going to allow the State to get into this for this reason: It is simply corroboration for an event for which I have already allowed in as a prior bad act. I think that's what you offered it for. I previously gave my rulings why I would allow testimony about that bad act, I have done so. It appears to me that this is basically corroboration for that."

Then, the judge found that if the proper foundation was laid, the diary would be admitted. Vivian testified that around March 1998, she found the "notebook" (diary) in Flournoy's bedroom. She recognized his writing. When asked how she recognized the writing, Vivian said she "always read [her] children's writing" and recognized it. The judge admitted the diary.

Vivian read the following diary entry from May 1996 to the jury:

"May 29, same ole story that—a family freaking out on each other and me coming home and trying to get cussed out and put out, this time the rage took over and I decided to get help or kill her. I went to K.U.M.C. and was kept overnight."

We question the characterization of the diary entry as a prior crime or civil wrong under K.S.A. 60-455. Flournoy acknowledges that the diary entry was cumulative. As the district court noted, the diary entry corroborated Vivian's and Shiverla's testimony regarding Flournoy's May 1996 phone call, where he talked of killing Thomas. Under the facts here, a reasonable factfinder could con-

clude that the entry was relevant and tended to show Flournoy's intent, especially in light of his arguing that the killing was not intentional. The district court did not abuse its discretion in admitting the diary entry.

### Rebuttal Testimony Regarding Statements and Tests Performed during a Competency Exam

Next, Flournoy argues that the district court erred by allowing Robert Huerter, a psychologist at Larned State Hospital, to testify in rebuttal regarding his statements and tests. Flournoy contends that the hospital staff was required to give *Miranda* warnings before eliciting information from him. He asserts that because he did not receive a *Miranda* warning, his Fifth Amendment right against self-incrimination was violated.

Generally, " '[w]hen constitutional grounds are asserted for the first time on appeal, they are not properly before [this court] for review.' " *State v. Gould*, 271 Kan. at 404, (2001). The exceptions noted in *Pierce v. Board of County Commissioners*, 200 Kan. 74, Syl. ¶ 3, 434 P.2d 858 (1967), do not apply here.

After Flournoy's testimony, the State announced its intention to call Robert Huerter, a master's level psychologist, and Dr. J.L.L. Fernando, a psychiatrist, both from the Larned staff, to testify. They would testify "regarding the issue of blackouts and whether [Flournoy] suffered from any diminished mental capacity on the night of the killing, because they did evaluate him twice for that issue." Defense counsel objected, saying that this was not proper rebuttal evidence. The district court allowed the testimony.

We identify two problems confronting Flournoy in advancing this issue on appeal. First, he acknowledges that he did not object to Huerter's testimony on Fifth Amendment grounds. His objection was based on the questioning as improper rebuttal. The evidence was offered for purposes of impeaching Flournoy's testimony. Statements made under circumstances where the defendant was not properly *Mirandized* can be offered to impeach the defendant, as well as to rebut statements made during the defendant's testimony. *State v. Graham*, 244 Kan. 194, 201, 768 P.2d 259 (1989).

Rebuttal evidence is that which contradicts evidence introduced by an opposing party. The use and extent of rebuttal rests in the sound discretion of the district court. 244 Kan. at 199-200. The erroneous admission of rebuttal evidence is not grounds for reversal unless discretion has been abused to defendant's prejudice. *State v. Valdez,* 266 Kan. 774, 795, 977 P.2d 242 (1999).

In *Graham,* during its case in chief, the State sought to introduce Graham's incriminating post-arrest statements made in jail. The district court ruled that the statements were inadmissible because they had been obtained during a custodial interrogation without complying with the *Miranda* procedure. 244 Kan. at 200-01. Later, after Graham had testified, the State sought to introduce the statements to rebut his testimony. The district court found that under *Harris v. New York,* 401 U.S. 222, 28 L. Ed. 2d 1, 91 S. Ct. 643 (1971), Graham's statement that a certain officer was "bound to get lucky and catch him with drugs sooner or later" was proper rebuttal testimony and could be used to impeach Graham's testimony. 244 Kan. at 201. *Harris* held that admissions made by the accused to police officers, which were inadmissible in the State's case in chief to establish guilt due to noncompliance with *Miranda* rules, could be used for impeachment where "(1) such statements are inconsistent with defendant's trial testimony bearing directly on the crimes charged, and (2) the accused makes no claim that his statements were coerced and involuntary." 401 U.S. at 224-26. We observe that Flournoy does not argue that statements made at Larned were coerced and involuntary. Unlike the situation in *Estelle v. Smith,* 451 U.S. 454, 68 L. Ed. 2d 359, 101 S. Ct. 1866 (1981), Huerter's testimony regarding Flournoy's statements was used to rebut Flournoy's testimony that he had blacked out and did not remember committing the murder.

The second problem with Flournoy's argument on this issue is that Dr. Fernando, the Larned psychiatrist who evaluated Flournoy, also testified in rebuttal. Dr. Fernando's testimony addressed blackouts:

"[THE PROSECUTOR]: So was there anything in these records including medical care records that included other than the one alcohol binge that he had that

caused a blackout. Was there anything that suggested that he had a medical problem that would cause blackout?'

"[DR. FERNANDO]: No.

"[THE PROSECUTOR]: Or a mental problem that would cause it?

"[DR. FERNANDO]: No."

In framing the *Miranda* Fifth Amendment issue and in developing his argument in his brief, Flournoy only targets Huerter's testimony. Flournoy's narrative in support of this issue contains only a passing conclusory reference to Dr. Fernando. Any objection to Dr. Fernando's testimony appears to have been abandoned. See *State v. Pratt*, 255 Kan. 767, 773, 876 P.2d 1390 (1994). Flournoy could not have been prejudiced by the cumulative testimony of Huerter, the psychologist.

In the alternative, Flournoy argues that the rebuttal testimony of Huerter and Fernando was inadmissible under K.S.A. 60-447 as character evidence. Flournoy complains specifically about Huerter's opinion concerning Flournoy's ability to form the requisite intent, lack of mental defect, ability to distinguish between right and wrong, and his scoring high on the antisocial and narcissistic personality scales. Flournoy's contention lacks merit. First, the rebuttal evidence in question here was not offered as evidence of Flournoy's "character traits." Second, Flournoy made no K.S.A. 60-447 objection at trial. See K.S.A. 60-404.

### Flournoy's Theory of Defense, Failure to Instruct

Finally, Flournoy contends that the district court erred in failing to instruct the jury on his theory of defense, *i.e.*, that he was experiencing a blackout at the time he killed Thomas.

We have frequently said that a defendant is entitled to an instruction on the theory of defense if the theory is supported by evidence. Also, " 'there must be evidence which, viewed in the light most favorable to the defendant, would justify a jury finding in accordance with the defendant's theory.' [Citation omitted.]" *State v. Gonzales*, 253 Kan. 22, 23, 853 P.2d 644 (1993). Flournoy acknowledges that he made no request for a blackout instruction. Thus, our standard of review requires reversal only if the district court's failure to give the instruction was clearly erroneous. *State*

*v. DeMoss*, 244 Kan. 387, 391-92, 770 P.2d 441 (1989). See K.S.A. 2000 Supp. 22-3414(3).

After Flournoy rested his case, the parties discussed jury instructions off the record. When they were back on the record, defense counsel requested a voluntary manslaughter instruction that was not given but made no objection to the court's proposed instructions. For reasons unknown, since no record was taken, the district court gave an instruction consistent with PIK Crim. 3d 54.12-B on diminished mental capacity:

"Diminished mental capacity may be considered in determining whether the defendant was capable of forming the necessary intent to kill and pre-meditation."

Despite the fact that a diminished capacity instruction was given, Flournoy argues on appeal that a "blackout" instruction should have been given. We disagree. He cites *State v. Massey*, 242 Kan. 252, 747 P.2d 802 (1987), to support his argument. Massey was convicted of the first-degree murder of his wife. His defense was that he must have discharged the gun accidentally while in the throes of a seizure. 242 Kan. at 255. A doctor testified that Massey could have had a seizure from alcohol withdrawal. The district court gave a general jury instruction on intent, but not a separate instruction on unconsciousness induced by seizure. Massey objected only to a second-degree murder instruction. He proposed no additional instructions.

In determining whether the evidence in *Massey* was sufficient to require an unconsciousness-due-to-seizure instruction, we noted that the only evidence that Massey had a seizure at the time of the shooting was his own testimony. However, we also pointed out that there was clear evidence, both expert and eyewitness, that Massey suffered from seizures, and he had received medical treatment for his condition. In addition, a deputy sheriff saw Massey have a seizure in his cell 2 days after the shooting. Massey, we observed, was not claiming diminished capacity; he was claiming "lack of capacity by reason of a grand mal seizure," a defense accepted in this state. 242 Kan. at 256, 259. We concluded that the district court's failure to instruct on Massey's defense was clearly erroneous.

In finding that an unconsciousness instruction should have been given at Massey's trial, we said: "This is not to say the uncorroborated testimony of a defendant in a criminal case that he was unconscious by reason of a seizure at the time of the commission of an alleged crime is sufficient to require an instruction on unconsciousness." The corroboration in Massey's case, however, required such an instruction. 242 Kan. at 261.

Other than Key's testimony, Flournoy presented no other corroborating evidence, expert or eyewitness, of his suffering from blackouts. Flournoy admitted that in June 1996, he filled out a questionnaire for the City Union Mission in which he said that he had no physical disabilities. He also admitted that on the questionnaire he said he had suffered one blackout that was caused from drinking a large amount of alcohol. He claimed no physical ailment on the questionnaire. When asked if Flournoy had told her of physical ailments impairing his memory, Flournoy's mother said, "No."

The notes on use to PIK Crim. 3d 54.12-B say that the diminished capacity instruction is applicable only to crimes committed before January 1, 1996. See K.S.A. 22-3220. The crimes here were committed on November 26, 1997. Flournoy, acknowledging *State v. Hedges,* 269 Kan. 895, 8 P.3d 1295 (2000), and *State v. Jorrick,* 269 Kan. 72, 81, 4 P.3d 610 (2000), does not argue the giving of 54.12-B as an independent issue on appeal. As in the *Hedges* case, the diminished capacity instruction was actually beneficial to Flournoy. He was given the possibility of a defense he was not entitled to receive under the law applicable to his case. The substance of the diminished capacity instruction focused on Flournoy's ability to form intent. See *Hedges,* 269 Kan. at 904. The jury could have concluded that Flournoy lacked the necessary intent due to a blackout. Failure to give a blackout instruction was not clearly erroneous.

Finally, the contention that the K.S.A. 21-4638 hard 40 sentencing scheme is unconstitutional is disposed of adversely to Flournoy by our holding in *State v. Conley,* 270 Kan. 18, 11 P.3d 1147 (2000), *cert. denied* 532 U.S. 932 (2001).

Convictions affirmed, sentence vacated, and case remanded for resentencing.