NOT DESIGNATED FOR PUBLICATION

No. 128,426

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

v.

TIGER J. SMILEY,
*Appellee.*

MEMORANDUM OPINION

Appeal from Douglas District Court; SALLY D. POKORNY, judge. Submitted without oral argument. Opinion filed January 23, 2026. Affirmed.

*Jon Simpson*, senior assistant district attorney, *Dakota Loomis*, district attorney, and *Kris W. Kobach*, attorney general, for appellant.

*John W. Kerns* and *Nicholas David*, of The David Law Office LLC, of Lawrence, for appellee.

Before ARNOLD-BURGER, P.J., MALONE and BOLTON FLEMING, JJ.

PER CURIAM: Kansas courts apply a reasonable diligence rule when determining whether a witness is unavailable such that their prior statements, which would otherwise be considered hearsay, can be admissible at trial. The proponent must make a good faith and diligent effort to obtain the witness' presence before a court will deem the witness unavailable. Here, the district court denied the State's pretrial motion to have an essential witness declared unavailable and the State appeals. Because we find that the district court did not abuse its discretion in finding a lack of diligent efforts by the State to obtain the witness' presence at trial, we affirm.

1

*The State charges Smiley with a series of sexual assaults.*

In April 2023, the State filed complaints charging Tiger J. Smiley and three codefendants with crimes related to their alleged participation in a series of sexual assaults perpetrated upon Jess (a pseudonym used by the parties in their briefing that we adopt here) over the course of a weekend in March 2023.

In June 2023, the district court held a preliminary hearing. Although the State had subpoenaed Jess to testify before the hearing by personal service, she was not present at the outset of the hearing. The State told the court that Jess had said she "is not feeling well," but the State believed they could present testimony from the other witnesses "with the hope that [Jess] will be here late afternoon or after the lunch break . . . ; and if she is not here, I will ask to bifurcate the hearing." The State added that Jess "has been cooperative up to this point." Smiley objected to proceeding without Jess present. The State assured the court that Jess had said she could be there "by 2:30 [that] afternoon," and if she did not appear, the State would request a material witness warrant and a bifurcation so that Jess could testify and be subject to cross-examination. The court elected to proceed with the State's other witnesses, cautioning the State that it could dismiss the case without prejudice if Jess failed to appear without good cause.

At around 2:30 p.m.—during the State's direct-examination of one of its witnesses, Smiley's defense counsel asked for a status update on Jess. The State explained that the latest update was that about thirty minutes prior Jess' defense counsel in another case was waiting to pick her up. Sometime later, during the same witness' cross-examination, the State told the court that Jess had arrived. Jess took the witness stand and testified about her memory of the events, and about the fact that the events had been videotaped without her knowledge.

Each defense attorney had the opportunity to cross-examine Jess, questioning her about how she knew each of the codefendants and her recollection of other details. Relevant to this appeal, Jess said during cross-examination that she did not show up at the beginning of the preliminary hearing because she "didn't want to be here." She let her attorney know the night before that she "was feeling under the weather," and she had planned not to show up that morning.

After Jess finished testifying, the district court adjourned the preliminary hearing and set the matter to resume in August 2023. Before concluding the hearing, the court directed Jess to return and be available in case defense counsel wanted to recall her as a witness.

When the preliminary hearing resumed in August 2023, Jess was not present. After completing its questioning of another witness, the State rested. The district court bound Smiley and the three codefendants over on all charges. At that time, the court anticipated the cases proceeding to a joint trial with all four defendants.

About nine months later on May 1, 2024, the district court held a motions hearing involving all four codefendants. At the outset, the district court brought up whether Jess would be available to testify at trial, given there was a pending bond forfeiture warrant for her arrest which "obviously, by the look on the State's face, they're not aware of that." One of the prosecutors handling the State's case assured the court that they had been in contact with Jess "as recently as last week" and despite being "out of state . . . she's still cooperative with our office in regards to this case." The other prosecutor added Jess was aware of the criminal charges pending against her and that "[w]e do intend to proceed on these cases, however we need to." The court remarked that "there are ways to proceed without the presence of certain witnesses but I don't think this is the kind of case where the State should think that they could proceed without their main witness." In response, the prosecutor asserted "if that becomes an issue down the road, that's certainly

something that the State would bring before the Court. However, the State anticipates having the victim here for the trial of these matters."

For unrelated reasons, the parties and district court agreed to bifurcate the trial into two joint trial dates. The trial on the charges against two of the codefendants would occur in July 2024, then the trial on the charges against Smiley and the other codefendant would occur in October 2024.

*The district court denies a motion to declare Jess unavailable in the trial against two codefendants, resulting in the dismissal of their charges without prejudice.*

About two weeks before the July 2024 jury trial in the cases against two of the three codefendants, Malachi Thomas and Dionte Brown, the district court held another motions hearing. After denying a suppression motion, the court asked the attorneys for a status update on Jess. The State explained that "to the best of our knowledge," Jess was now living in a homeless shelter in Maricopa County, Arizona. Detective Bardwell's last contact occurred on June 14, 2024—two weeks before the hearing. She told Bardwell she was willing to return to Kansas to testify if the State could book her travel arrangements. But the State added that it "anticipate[d] a scenario in which the State may ask the Court to declare her unavailable since she's outside of our jurisdiction." While the State hoped Jess would return because of her cooperation, the prosecutor said they had "started the process for an out-of-state subpoena" and had been in contact with law enforcement officers in Maricopa County. At the parties' request, the court set a hearing the following week to address an anticipated motion by the State to have Jess declared unavailable as a witness.

The district court took up the matter at a hearing six days before the scheduled trial. The State presented testimony from three witnesses who had been in contact with Jess over the course of the proceedings, including Detective Bardwell, as well as an

4

investigator, and the victim/witness coordinator for the Douglas County District Attorney's office. Through their testimony, the State established that Jess had moved to Arizona around November 2023, after which she had sporadic contact with each witness. According to Detective Bardwell, her last contact from Jess was a text message on June 14, 2024, stating that she would return to Kansas to testify if her fiancé could come with her. Detective Bardwell also testified that Jess had contacts with law enforcement in Maricopa County near the end of May 2024. The investigator, Andrew Putnam, testified that he learned of Jess' absence on June 24, 2024, after which he worked to obtain an out-of-state subpoena. LaShane Cupil, the victim/witness coordinator, testified she last saw Jess shortly after the preliminary hearing and did not attempt to contact her again until June 18, 2024.

After hearing the evidence and parties' arguments, the district court declined to find Jess unavailable. The State therefore dismissed the cases against those two codefendants without prejudice.

*The district court denies the State's motion to declare Jess unavailable in the trial against Smiley, resulting in this interlocutory appeal.*

Then, on October 9, 2024, six days before the beginning of Smiley's trial, the State likewise moved to declare Jess an unavailable witness and allow her prior testimony to be read and hearsay statements admissible at trial. The State asked the court to find Jess unavailable due to being "absent beyond the jurisdiction of the court to compel appearance by its process" or "absent from the place of hearing because the proponent of his or her statement does not know and with diligence has been unable to ascertain his or her whereabouts" as provided in K.S.A. 60-459(g)(4), (5).

The district court did not take up the motion until the first day of the scheduled trial, agreeing to take judicial notice of the transcript of the July hearing but stressing that

5

its focus would be on "what was done after the dismissal of those prior two cases." The State presented testimony from the same three witnesses as at the July hearing—along with an additional fourth witness—about the State's subsequent efforts to secure Jess' presence, which consisted first of seeking an out-of-state subpoena under K.S.A. 22-4201 et seq., the Uniform Act to Secure Attendance of Witnesses from Without State (Uniform Act). Vanessa Peda was the trial assistant tasked with issuing that subpoena in early July 2024. After obtaining all the necessary signatures for the documents, Peda sent a packet containing the subpoena documents by certified mail to the Maricopa County district attorney's office. Yet she never received the return receipt for the certified mailing.

Meanwhile, Cupil continued trying to contact Jess to no avail. Cupil and Detective Bardwell also were in contact with Jess' mother in Minnesota, but Jess had also not been responding to her phone calls or texts. Detective Bardwell further testified about communicating with Maricopa County investigators and an out-of-state process server about locating and serving Jess. Cupil testified that she checked the Maricopa County jail logs to keep tabs on whether Jess had been taken into custody. In early September 2024, Cupil noticed that Jess had been arrested ten days prior and was in the Maricopa County jail, due to appear in court the next day. She notified the Douglas County prosecutors, who "from [her] understanding," contacted the Maricopa County district attorney and sheriff's offices to see about getting Jess back to Kansas. After learning Jess was in custody, the State requested the Douglas County sheriff's office make her Douglas County warrants "fully extraditable."

Detective Bardwell testified that despite the Maricopa County officials confirming they knew about the extraditable warrant, the Maricopa County jail released Jess at around 3 a.m. on September 21, 2024. When she spoke with a jail employee, they did not give a reason for Jess' release. Bardwell contacted a sergeant in the Phoenix Police Department, and an officer was able to locate and rearrest Jess later that date. The Maricopa County jail then "refused" to take Jess in, "based on some substance that she

6

was on and released her back to a hospital, and then she was in the wind again." Nobody had been able to contact Jess since then.

After hearing the evidence and parties' arguments, the district court again declined to find Jess unavailable in a lengthy oral ruling, determining the State failed to show the diligent efforts required to find she was unavailable. The court first explained that it should have been clear to the State after the July 2024 hearing and dismissal of the first two codefendants' cases that Jess would not return to Kansas voluntarily. At that point, the State chose to request an out-of-state subpoena under the Uniform Act, rather than to seek an order compelling her appearance and having her held in custody. The court was also concerned that the State sent the paperwork for the summons by certified mail and then did not follow up when they received no return receipt to show it was ever served.

The district court went on to discuss how it believed the State then waited too long to begin the extradition process for Jess' outstanding Douglas County warrants. Because there was no guarantee Jess would waive her right to an extradition and the process could take up to 90 days, she would still not be present in time for trial even if arrested immediately after the warrants were made extraditable. The court explained that no evidence showed that the State had taken steps in May 2024 to make her Kansas warrants extraditable, and the Arizona authorities might have been more diligent about getting her into custody had that happened. The court also pointed out that it apparently knew about Jess' outstanding Kansas warrants before the State, further showing lack of diligence. While the court agreed that nobody in Kansas could force someone in Arizona to take certain actions, "when there has been this long history of notice, the due diligence should have started right after that other case was dismissed as far as making sure that those warrants were extraditable." The court concluded that

"the bottom line is I am saying her testimony cannot be used at the trial based upon insufficient diligence for the material witness bond and then a delay in making those

7

warrants extraditable to actually get the defendant here in a timely fashion, even under those warrants so that she would be available in person. The attempt at extradition was too little too late."

The State timely filed an interlocutory appeal.

ANALYSIS

*We have jurisdiction over this appeal.*

The State is statutorily authorized to file an interlocutory appeal within 14 days of any "order . . . suppressing evidence." K.S.A. 22-3603. The Kansas Supreme Court has said the definition of "'suppressing evidence'" includes "rulings of a trial court which exclude state's evidence so as to substantially impair the state's ability to prosecute the case." *State v. Newman*, 235 Kan. 29, 34, 680 P.2d 257 (1984). Smiley does not contest that the district court's unavailability determination substantially impaired the State's ability to prosecute the charges against him. And a review of the record confirms the State's authority to bring this interlocutory appeal.

Smiley stands charged with raping Jess, as well as aiding and abetting three codefendants in the rape of Jess. An essential element of these offenses requires proving that Jess did not consent to sexual intercourse and was "unconscious or physically powerless." K.S.A. 21-5503(a)(1)(B). We can easily conclude that without testimony from Jess on these points, the State's ability to prosecute Smiley is substantially impaired because it would be much more difficult to prove these essential elements given the defenses likely to be raised by Smiley and his codefendants. Accordingly, this court has jurisdiction over the State's interlocutory appeal.

*The appeal is not moot.*

Kansas appellate courts generally do not decide moot questions or render advisory opinions. *State v. Roat*, 311 Kan. 581, 590, 466 P.3d 439 (2020). "A case is considered moot when a court determines that "'it is clearly and convincingly shown the actual controversy has ended, the only judgment that could be entered would be ineffectual for any purpose, and it would not impact any of the parties' rights."'" *Sierra Club v. Stanek*, 317 Kan. 358, 361, 529 P.3d 1271 (2023). A case is not moot if "it may have adverse legal consequences in the future." *State v. Montgomery*, 295 Kan. 837, Syl. ¶ 4, 286 P.3d 866 (2012).

Smiley alleges that the State's appeal is moot because at the time he filed his brief, Jess was incarcerated in the Douglas County jail. He claims the controversy is now over. Smiley bears the initial burden of establishing that a case is moot in the first instance. See *Roat*, 311 Kan. at 593. He fails in his burden.

Both parties agree that Jess returned to Douglas County at some point after the State filed this appeal. According to the State, as of the filing of its brief, Jess "has been or will be released to start her probation living in a Douglas County area sober-living facility." But the State disagrees that the underlying controversy is over. We agree with the State, but for reasons different from those it argues.

The primary question before this court is whether the district court correctly determined the State failed to demonstrate it acted in good faith and made a diligent effort to secure Jess' presence before the October 2024 trial given the circumstances *existing at the time*. The fact that Jess may or may not be available now has no bearing on the district court's October 2024 ruling, which is all we are asked to review. The State's concerns about Jess potentially refusing to testify or any speedy trial implications are

9

beyond the scope of this appeal and better addressed by the district court at the appropriate time, should they come to fruition.

*The district court did not abuse its discretion in refusing to declare Jess unavailable.*

As previously noted, as it applies to this case, a witness is unavailable when

"(4) absent beyond the jurisdiction of the court to compel appearance by its process, or (5) absent from the place of hearing because the proponent of his or her statement does not know and with diligence has been unable to ascertain his or her whereabouts." K.S.A. 60-459(g).

Kansas courts apply a reasonable diligence rule when determining whether a witness is unavailable under these provisions, requiring the proponent to show they acted in good faith and made a diligent effort to obtain the witness' presence at trial. S*tate v. Green*, 320 Kan. 539, 552, 570 P.3d 1189 (2025); *State v. Keys*, 315 Kan. 690, 709, 510 P.3d 706 (2022); *State v. Zamora*, 263 Kan. 340, 342, 949 P.2d 621 (1997). "The question of good faith effort turns on the totality of the facts and circumstances of the case." *State v. Flournoy*, 272 Kan. 784, 800, 36 P.3d 273 (2001) (citing *Zamora*, 263 Kan. at 342).

The State contends the district court erred by not finding Jess to be unavailable and by refusing to admit her preliminary hearing testimony or hearsay statements at Smiley's upcoming trial.

We review a district court's decision regarding a claim that a witness is unavailable for an abuse of discretion. *Keys*, 315 Kan. at 708. A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *State v. Younger*, 320 Kan.

10

98, 137-38, 564 P.3d 744 (2025). As the party asserting the district court abused its discretion, the State bears the burden of showing such abuse. *State v. Peters*, 319 Kan. 492, 497-98, 555 P.3d 1134 (2024).

The State argues that the district court abused its discretion here in three ways: (1) judging the State's extradition efforts inadequate by erroneously applying an incorrect standard to a hypothetical factual scenario; (2) unreasonably attributing Jess' absence to inadequate diligence by the State in initially using nonforceful approaches to return her to Kansas; and (3) unreasonably concluding Jess' absence was caused by the State. Smiley responds that the district court's decision was supported by substantial competent evidence, and that the State's arguments ignore the applicable standard of review by asking this court to reweigh the evidence.

The district court began its ruling by discussing the reasons it had denied a similar request by the State in Smiley's codefendants' cases, which was that the evidence presented in the July 2024 hearing showed the State "was relying upon a wing and a prayer to have the victim appear." The court noted that the evidence showed "the victim's lack of responsiveness" to numerous communications from the prosecution team, coupled with the State's "fail[ure] to timely issue a request for an out-of-state subpoena for a material witness."

But more relevant to Smiley's case, the court explained that after the State dismissed his codefendants' cases in July, Jess stopped responding to communication by the prosecution team and had failed to report for probation in Maricopa County. Thus, the court found "it's very clear that we know she is not going to voluntarily appear, nor is she going to follow a court order to appear." Yet, despite this evidence, the district court explained that the State chose merely to request a summons via out-of-state subpoena, which "assumes that the victim is going to cooperate," and then failed to follow-up when they did not receive a certified mail return receipt. For these reasons, the court concluded

11

that "as far as due diligence . . . I do not believe the State used due diligence." In other words, even before addressing the State's delayed extradition efforts, the district court believed the State failed to meet its burden to show a good faith and diligent effort to obtain Jess' presence at trial.

As to this part of the district court's ruling, the State mainly challenges the district court's factual finding that "no evidence" showed they followed up on the out-of-state subpoena mailed to Maricopa County. As the State admits, Peda, the trial assistant, testified she never received the return receipt for the subpoena packet after mailing it in July 2024, and that she was "not a hundred percent sure" if she emailed the documents under the "standard process." And while the victim/witness coordinator, Cupil, testified she was periodically checking the Maricopa County jail records and knew the State was "trying to get her served with a subpoena," her involvement ceased after she notified the Douglas County prosecutors that Jess was in custody in September. That said, other testimony establishes that Detective Bardwell was often contacting several individuals in Maricopa County—including an out-of-state process server—about "trying to contact" and attempt to locate Jess to serve the subpoena. After the Maricopa County jail released Jess "on September 21st," Detective Bardwell then talked with the same individuals "who were trying to process—like serve her the subpoena to be here."

Even considering this evidence, the State's argument misses the point. The district court did not believe they made diligent efforts because the evidence showed only one side of the conversation between the Douglas County and Maricopa County district attorney's offices. Without sufficient proof that someone in Maricopa County received the subpoena documents, the court could not conclusively determine why personal service was never obtained on Jess.

Next, although the State continues to insist that it believes Jess might still be a cooperative witness, they fail to show that the district court abused its discretion by

12

finding that the State knew or should have known that Jess would not voluntarily appear after she stopped responding in June 2024. As the State admits, the evidence shows that Jess last affirmed her willingness to testify in June 2024—roughly two weeks before the State started the Uniform Act's out-of-state subpoena process. It was not unreasonable for the district court to conclude that the lack of communication from Jess should have signaled to the State that more forceful methods of securing her appearance should have begun immediately, rather than waiting and hoping that the out-of-state subpoena would eventually be served.

Accordingly, the district court then discussed the evidence related to the State's efforts to have Jess extradited, which essentially did not begin until she was taken into custody in Arizona in early September 2024. In short, the court believed the State's extradition efforts were "too little too late" because trial was only about a month away. The State focuses heavily on the hypothetical nature of the court's comments on this point, asserting several claims of factual and legal error, but this court cannot ignore the full context of the court's discussion. Under the totality of the facts and circumstances before the court, it was appropriate to point out that the State's delayed extradition efforts would have been more effective had they begun much earlier. Again, the State's belief that Jess was still a cooperative witness is undercut by the evidence showing a lack of communication with the State's prosecution team, and it was not unreasonable to conclude that the State failed to act diligently in how it went about trying to secure her appearance at Smiley's trial.

We find the district court did not abuse its discretion in declining to find Jess was an unavailable witness and refusing to allow the State to present her preliminary hearing testimony at trial.

Affirmed.

13