IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 115,227

STATE OF KANSAS,
*Appellee*,

v.

JEREMY CLAERHOUT,
*Appellant*.

SYLLABUS BY THE COURT

1.

Evidence of a prior diversion agreement for driving while intoxicated may be relevant to establishing that a defendant was on notice that driving while intoxicated is dangerous.

2.

The admissibility of evidence under K.S.A. 60-455 is subject to harmless error analysis on appeal.

3.

It is not necessary that an expert witness demonstrate expertise in every theory, principle, or scientific discipline underlying the knowledge, skill, experience, training, or education that may qualify an expert witness to give testimony.

4.

Voluntary intoxication is not a defense to reckless second-degree murder.

Review of the judgment of the Court of Appeals in 54 Kan. App. 2d 742, 406 P.3d 380 (2017). Appeal from Johnson District Court; SARA WELCH, judge. Opinion filed December 6, 2019. Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

*Meryl Carver-Allmond*, of Capital Appellate Defender Office, argued the cause and was on the brief for appellant.

*Kendall S. Kaut,* assistant district attorney, argued the cause, and *Shawn E. Minihan*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.: Driving while intoxicated, Jeremy M. Claerhout caused the death of another driver in a rear-end collision. He was convicted of reckless driving and second-degree murder for unintentional but reckless homicide. A divided panel of the Court of Appeals affirmed the conviction, and this court granted review on all issues for which review was sought.

The facts underlying the legal issues in this case are essentially undisputed.

## FACTS

On the afternoon and evening of January 11, 2015, Claerhout and two friends visited several bars in Olathe, Kansas. All three men consumed beers and cocktails at each of the bars, and, based on his own recollections and the testimony of bartenders, it is estimated that Claerhout consumed approximately five 12-ounce beers, four 24-ounce beers, one 32-ounce beer, and one or two vodka cocktails that afternoon and evening.

2

After about an hour at the third bar, the three men got into Claerhout's black Ford F-150 pickup truck and headed back toward a bar they had visited earlier. Claerhout was driving.

A short time later, a witness standing outside her place of employment saw a white car drive by; a few seconds later she saw a black Ford truck go by at a high rate of speed, its engine revving and the tires spraying water in the rain. Ten to 15 seconds afterwards, she heard a loud impact sound, which prompted her to call 911. Another witness, who was stopped at an intersection, saw a white Mazda propelled past the intersection at approximately 90 miles per hour out onto the right side of the grassy shoulder, hit and break a cable pole, proceed at least another 100 yards, and come to a stop upon colliding with an iron fence on the other side of the street. She saw a black pickup truck approaching from behind and at the same speed as the Mazda; it then slowed to a stop. She also called 911.

Police and paramedics found the Mazda smashed into a wrought iron fence. The driver was wearing his seatbelt, and the airbags had deployed. The driver's seat was broken off its track and had slid backwards, and the driver was unconscious, on the dashboard and facing the roof.

The front of the truck was damaged, and a piece from the rear end of the Mazda was stuck in the front end of the truck. The three occupants of the truck all told police that they did not know what had happened. Claerhout had bloodshot, watery eyes and the odor of alcohol on his breath, and he was slurring his words. He was smoking a freshly lit cigarette, which officers asked him to extinguish. He put out the cigarette but then lit another one and continued to smoke it after being asked to put it out. He said he had no idea what happened. Police performed walk-and-turn and one-leg-stand field sobriety

tests on him, which he failed. He was arrested and taken to a police station, where an Intoxilyzer 8000 breath test was administered at 11:30 that night. The breath sample indicated a blood alcohol content of .211, more than twice the legal limit of .08.

The accident took place in a mixed residential and office area where the speed limit was 40 miles per hour. Based on tracks on the grass and the roadway as well as damage to objects along the way, Officer John Moncayo reconstructed what happened before and after the collision. There was no braking by either vehicle before the collision. The truck struck the Mazda at a slight angle on the rear passenger side, propelling the Mazda onto the grass, where it struck and sheared off a medium-sized tree at its base. The car continued forward and struck a utility pole, breaking it in half and leaving the top half of the pole suspended by the cable line. The car then swerved back onto the road, crossed the center line, struck the curb, went over a small hill, and stopped when it struck a wrought iron fence. In all, the Mazda traveled some 848 feet after the impact.

The driver, Christopher Willdermood, was taken to a nearby hospital, where imaging showed significant bleeding in the back of his brain. He was declared brain-dead on February 14, 2015. Blood analyses showed no signs of narcotics or alcohol in his body. The cause of death was listed as complications from a blunt injury to the head.

The State charged Claerhout with second-degree murder for unintentional but reckless homicide or, in the alternative, involuntary manslaughter while driving under the influence of alcohol, and an additional count of reckless driving. The defense theory at trial was that Claerhout was highly intoxicated and incapable of safely driving at the time of the accident, and he therefore was guilty of involuntary manslaughter but not guilty of second-degree murder.

4

The jury entered a verdict of guilty on the count of second-degree murder, guilty on the count of involuntary manslaughter while driving under the influence of alcohol, and guilty of the count of reckless driving. Because the jury found Claerhout guilty of both alternative homicide charges, the trial court vacated the conviction on the count of involuntary manslaughter while driving under the influence. The court sentenced him to a standard term of 117 months for second-degree murder and a concurrent 30-day sentence for reckless driving.

A panel of the Court of Appeals affirmed the conviction, with one judge dissenting. *State v. Claerhout*, 54 Kan. App. 2d 742, 406 P.3d 380 (2017) This court granted review on all issues raised in the petition for review.

ANALYSIS

*Evidence of Prior Diversion Agreement*

In 2010, Claerhout entered into a diversion agreement subsequent to an arrest for driving while intoxicated. According to the statements of counsel at a motion to suppress, the arrest was made after a stop for a missing tail light; there was no indication of dangerous driving and no accident was involved. At trial, the State was allowed to introduce the diversion agreement, without explanation, for the purpose under K.S.A. 2016 Supp. 60-455(b) of proving knowledge that driving while intoxicated is dangerous. Claerhout argues that this evidence should not have been introduced at all, and the manner in which it was introduced defeated the statutory basis for admitting it.

K.S.A. 2018 Supp. 60-455(a) makes evidence of a prior crime or civil wrong inadmissible for the purpose of proving a disposition to commit such an act on another

5

occasion. K.S.A. 2018 Supp. 60-455(b) allows such evidence of a prior crime or civil wrong when it is "relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."

When the State seeks to introduce evidence of prior bad conduct under K.S.A. 60-455, that evidence must be material, and its probative value must outweigh its potential for producing undue prejudice. *State v. Gunby*, 282 Kan. 39, 48, 144 P.3d 647 (2006). Whether such evidence is material—meaning that the evidence has some real bearing on the decision in the case—is reviewed independently, without deference to the district court. Whether the evidence is relevant to prove a disputed material fact is reviewed only for abuse of discretion. Whether the probative value of the evidence outweighs the potential for undue prejudice against the defendant is also reviewed only for abuse of discretion. *State v. Haygood*, 308 Kan. 1387, 1392-93, 430 P.3d 11 (2018).

A district court abuses its discretion when:  (1) no reasonable person would take the view adopted by the judge; (2) a ruling is based on an error of law; or (3) substantial competent evidence does not support a finding of fact on which the exercise of discretion is based. *State v. Boysaw*, 309 Kan. 526, 539, 439 P.3d 909 (2019).

The jury found Claerhout guilty of both reckless second-degree murder and involuntary manslaughter. Claerhout contends the diversion agreement was improperly introduced in order to prove recklessness and, without it, the jury might have convicted him of only the involuntary manslaughter charge.

K.S.A. 2018 Supp. 21-5403(a)(2) defines reckless second-degree murder as the killing of a human being committed "unintentionally but recklessly under circumstances

6

manifesting extreme indifference to the value of human life." This crime is a severity level 2 person felony. K.S.A. 2018 Supp. 21-5403(b)(2).

Advocating outside the presence of the jury for admitting the diversion agreement, the prosecutor stated the purpose of the diversion evidence was to prove to the jury that Claerhout had been educated to the reality that driving while intoxicated was dangerous and his decision to drive while intoxicated was therefore reckless.

The court agreed with the State's basis for admitting the evidence, stating that the diversion agreement would demonstrate that Claerhout "should be on notice as to what the problems of drinking and driving are based upon his prior experience." The Court of Appeals agreed, holding that the diversion agreement was relevant to show Claerhout's heightened knowledge of the risks of driving under the influence. 54 Kan. App. 2d at 750-51.

The Tenth Circuit Court of Appeals has considered a similar question and agreed that evidence of prior drunk driving is admissible as tending to show knowledge of the dangers of driving while intoxicated:

>"A jury could infer from Defendant's prior drunk driving convictions that he is especially aware of the problems and risks associated with drunk driving. We agree that '[o]ne who drives a vehicle while under the influence after having been convicted of that offense knows better than most that his conduct is not only illegal, but entails a substantial risk of harm to himself and others.'" *United States v. Tan*, 254 F.3d 1204, 1210 (10th Cir. 2001) (quoting *People v. Brogna*, 202 Cal. App. 3d 700, 709, 248 Cal. Rptr. 761 (1988).

7

Many courts have cited to *Tan* as support for admitting evidence of prior convictions for driving while intoxicated. See, e.g., *United States v. New*, 491 F.3d 369, 374-75 (8th Cir. 2007) (while evidence of prior crimes is not admissible to prove bad character or propensity to commit bad acts, it may be admissible to prove requisite knowledge); *United States v. Norris*, 649 F. Supp. 2d 968, 969-70 (D. Ariz. 2009) (evidence showing defendant previously convicted of driving under the influence admissible to prove malice), *United States v. Miller*, No. 13-CR-1867 WJ, 2014 WL 12796762 (D. N. Mex. 2014) (unpublished opinion); *State v. St. Clair*, 101 Haw. 280, 288, 67 P.3d 779 (2003) (evidence showing defendant involved in automobile accident while driving intoxicated less than four years before charged accident involving pedestrian death was relevant in manslaughter prosecution to prove defendant acted recklessly when driving after consuming at least 12 beers); *Commonwealth v. Diehl*, 2016 Pa. Super. 93, 140 A.3d 34, 40 (2016) (evidence of defendant's prior DUI convictions and alcohol awareness classes was admissible to establish mens rea in vehicular homicide case premised on DUI accident). See also *United States v. Loera*, 923 F.2d 725, 729 (9th Cir. 1991) (prior convictions admitted to prove malice); *United States v. Fleming*, 739 F.2d 945, 949 (4th Cir. 1984) ("[T]he driving record was relevant to establish that defendant had grounds to be aware of the risk his drinking and driving while intoxicated presented to others.").

We agree with our Court of Appeals and with courts in other jurisdictions. And while a diversion for driving under the influence is not a conviction, the statutory requirements and specific details outlined in the agreement essentially serve the same purpose in showing its relevance. (See generally K.S.A. 2018 Supp. 8-1567[i][1] and [i][6].) Even if it was never demonstrated what the content of the required instruction mandated by the diversion agreement was, or even whether he actually attended the educational programs, by agreeing to and signing the agreement Claerhout acknowledged

an understanding that driving while intoxicated is a dangerous and illegal activity. The jury reasonably could have concluded from the diversion agreement that Claerhout was on notice that driving while intoxicated is risky behavior, and his decision to engage in that behavior demonstrated reckless conduct.

This is not the end of the analysis, however. Claerhout argues that, even if the diversion agreement had some probative value, that value was outweighed by its prejudicial effect.

This court has established safeguards limiting the introduction of K.S.A. 60-455 evidence: The material fact that the evidence is introduced to prove must be disputed, and the probative value of the evidence must outweigh its potential for producing undue prejudice. *Boysaw*, 309 Kan. at 539.

The district court in the present case conducted a generalized, superficial weighing of the probative value of the evidence against the potential for undue prejudice, making the conclusory determination that "the probative value of the evidence outweighs its prejudicial effect."

Recognizing the risks that inhere in admitting evidence of other crimes or previous bad conduct, we recently articulated an analytic framework for district courts to apply before exposing jurors to such potentially prejudicial evidence:

> "In evaluating the probative value of evidence of other crimes or civil wrongs, the district court should consider, among other factors: how clearly the prior act was proved; how probative the evidence is of the material fact sought to be proved; how seriously disputed the material fact is; and whether the government can obtain any less

9

prejudicial evidence. In evaluating the possible prejudicial effect of evidence of other crimes or civil wrongs, the district court should consider, among other factors: the likelihood that such evidence will contribute to an improperly based jury verdict; the extent to which such evidence may distract the jury from the central issues of the trial; and how time consuming it will be to prove the prior conduct." *Boysaw*, 309 Kan. at 541.

In the present case, the district court's stated reasoning was so abbreviated that we cannot determine what factors, if any, it considered in reaching its conclusion that the probative value outweighed the potential prejudicial effect. To be sure, the *Boysaw* factors are not exclusive or all-encompassing, but the district court skirted carrying out its duty to protect a defendant from undue prejudice.

We need not at this time decide how little or how much analysis a district court must display to satisfy the *Boysaw* due process mandates. Reversible error does not necessarily result in failing to weigh various factors on the record. We have recognized an implicit determination by a district court that the probative value of K.S.A. 60-455 evidence outweighs the risk of undue prejudice when the court stated that it had reviewed other caselaw for guidance in carrying out such a weighing procedure. *State v. Remmert,* 298 Kan. 621, 628, 316 P.3d 154 (2014), *disapproved on other grounds by State v. Jolly*, 301 Kan. 313, 342 P.3d 935 (2015). Although the district court in the present case did not state on the record as much analysis as did the *Remmert* district court, we hold that any deficiency in the analysis was harmless.

Admission of evidence under K.S.A. 60-455 is subject to harmless error analysis. See, e.g., *Gunby*, 282 Kan. at 59. Here, the evidence was introduced for the stated purpose of tending to show that Claerhout was aware that driving while intoxicated is dangerous. Claerhout contends that the risk of prejudice is that the jury might instead

view the diversion agreement as evidence that he had a propensity to drive while intoxicated, thus suggesting that, even in the absence of evidence of actual intoxication in the present case, the jury would assume he was intoxicated or punish him for his prior offense.

That risk of undue prejudice is minimal here. The evidence that he was intoxicated was substantial and uncontroverted; Claerhout conceded intoxication in his opening and closing arguments. He further conceded that he was driving at a speed far in excess of the legal limit and that his driving caused the death of the victim.

Furthermore, the district court gave the jury a limiting instruction:

> "Evidence has been admitted tending to show that the defendant committed a crime other than the present crime charged. This evidence may be considered solely for the purpose of determining whether or not the defendant acted with extreme indifference to the value of human life as alleged in Count I."

This limiting instruction is required as a prophylactic to guard against the danger that the jury will view K.S.A. 60-455 evidence as tending to show propensity. See *Gunby*, 282 Kan. 39, Syl. ¶ 3; *State v. Wilkerson*, 278 Kan. 147, 153, 91 P.3d 1181 (2004). If such an instruction did not provide some protection against the harm of which Claerhout complains, it would be nothing more than a superfluous requirement.

We continue to encourage district courts to state on the record the factors considered in weighing the admissibility of K.S.A. 60-455 evidence. We disagree with the Court of Appeals panel majority when it stated that the district court was not required to explicitly weigh factors used in determining that the probative value of the evidence

11

outweighed its prejudicial effect because the same risk that the jury would be inclined to view the diversion agreement as propensity evidence arises every time K.S.A. 60-455 evidence is admitted. *Claerhout*, 54 Kan. App. 2d at 754. Not all evidence is equally prejudicial, just as not all evidence is equally probative. We nevertheless find any deficiencies in the district court's reasoning to be harmless.

*Police Officer's Testimony About Vehicle Speeds*

Over Claerhout's pretrial motion to exclude and over a continuing objection at trial, Officer Matt Misemer testified to crash data retrieval reports he generated from data stored in both the truck's and the car's airbag control modules. Misemer testified about his training in investigation and reconstruction, including the ability to analyze crash data retrieval download information. He concluded with an evaluation of the relative speeds of the two vehicles at the time of the collision. Claerhout argues on appeal that Misemer was not qualified to testify about scientific and mathematical conclusions.

The admission of expert testimony lies within the discretion of the district court and will not be reversed without a showing that the court abused its discretion. *State v. Graham*, 246 Kan. 78, 81, 785 P.2d 983 (1990).

Misemer testified about the relative speeds of the two vehicles at the time of the collision. He testified that the airbag control module records such information as vehicle speed, braking, throttle, and engine rotation and retains that information for five seconds. He explained that he used software that connected to the modules and that translated the raw data into usable information, such as vehicle speed.

12

His report on the data processing results showed that the truck was moving 86 miles per hour five seconds before impact and had accelerated to 92 miles per hour at the time of impact. The results showed that the truck was being driven at full throttle during that time; it could not accelerate any faster. Both the module data and the absence of skid marks showed that the brakes of the truck were not applied during the five seconds before contact.

Misemer next testified about the results downloaded from the Mazda. The data contained information about the five seconds before the car struck the tree, triggering the airbag. Earlier information, specifically at the moment of impact with the truck, was not preserved within the five-second loop. Five seconds before the car struck the tree, it was traveling 62 miles per hour, and it slowed to 47 miles per hour by the time of impact with the tree. Misemer entered this information, along with the data from the truck and the weight of the respective vehicles, into a formula to calculate the speed of the Mazda when the truck ran into it. He calculated that the Mazda was traveling at 47 miles per hour, plus or minus five percent, at the moment of the collision with the truck.

Claerhout did not cross-examine Misemer, and he offered no evidence to rebut Misemer's testimony.

K.S.A. 2018 Supp. 60-456(b) governs whether an expert witness is qualified to testify:

> "If scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue, a witness who is qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise if:  (1) The testimony is based on sufficient facts or data;

13

(2) the testimony is the product of reliable principles and methods; and (3) the witness has reliably applied the principles and methods to the facts of the case."

Claerhout challenges Misemer's expertise to testify about the scientific basis for reaching his conclusions about the velocities and acceleration or deceleration rates of the vehicles. Misemer conceded at a motion to suppress hearing that he did not understand the laws of physics on which the software platforms were based. On the other hand, Misemer presented considerable evidence that he was experienced and qualified to utilize the software and to understand the data that it provided him.

Claerhout would have this court adopt a requirement that experts be able to demonstrate their expertise from the ground up. For example, Claerhout challenged Misemer to show that he would be able to teach a college physics class and explain the difference between Newtonian and Einsteinian laws governing mass and momentum.

Claerhout's challenge would seem to require that an expert who presents testimony on what he or she has seen through a microscope must also be able to explain the optical qualities of microscopes, or that an expert on reading radiograms should be able to explain the high-energy physics of x-ray generation. We disagree that expertise in an area must extend to the theories and principles underlying the discipline that is the subject of the expert's testimony.

This court has not previously ruled on the degree to which an expert must be able to demonstrate knowledge of the principles underlying the expert's expertise. The statute states with simple clarity that "knowledge, skill, experience, training or education" are the prerequisite qualifications for serving as an expert witness. The statute does not require that training or experience must be so thorough that the expert understands the physics or

14

chemistry underlying the training or experience. As one federal district court stated: "We do not practice science in court and we do not insist that our expert witnesses do either." *Mercado v. Ahmed*, 756 F. Supp. 1097, 1101 (N.D. Ill. 1991).

Discussing a statute similar to our Kansas rule for admitting expert witnesses, the Georgia Court of Appeals explained:

> "The requirements for qualification as an expert witness are minimal; generally, nothing more is required to qualify an expert than evidence that the person has been educated in a particular trade, science, or profession. Formal education or training in an area of expertise is not necessary, provided the witness possesses the qualifications of such area of expertise through skill and experience. It is the possession of special knowledge derived either from experience, study, or both in a field of expertise that makes one an 'expert.' [Citations omitted.]" *In the Interest of C.W.D.*, 232 Ga. App. 200, 206, 501 S.E.2d 232 (1998).

Misemer testified to his training, proficiency testing, and extensive experience in accident reconstruction and using crash data retrieval. He demonstrated a special knowledge that would be helpful to the trier of facts. This background sufficed to meet the statutory requirements for qualification as an expert witness.

Claerhout did not challenge the reliability of the hardware in the vehicles at measuring data or of the software used in processing the data. The results to which Misemer testified were consistent with other evidence admitted at trial. Eyewitness Megan Kliethermes testified she thought Claerhout was driving 90 miles per hour just before the collision and the victim was not driving that fast. Eyewitness Hilda Avila testified that there was nothing unusual or contributory in the manner the victim was driving; his car drove past her "like any other vehicle would drive by." Misemer's

15

analysis of the electronic data provided simply confirmed the visual impressions of those witnesses.

We find nothing in the record that undermines either Misemer's expertise in reading crash data retrieval or the reliability of his testimony. Accordingly, we find no error.

*Voluntary Intoxication Instruction*

Claerhout sought to assert a voluntary intoxication defense against the charge of reckless second-degree murder, contending that his intoxication rendered it impossible for him to have a reckless state of mind. The district court denied his requested instruction, and the Court of Appeals affirmed. 54 Kan. App. 2d at 762-63. He argues that the defense refutes the element of a reckless state of mind.

This court follows a four-step progression when reviewing challenges to jury instructions: First, it considers the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; next, it applies unlimited review to determine whether the instruction was legally appropriate; then, it determines whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and finally, if the district court erred, this court determines whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 565 U.S. 1221 (2012). *State v. Murrin*, 309 Kan. 385, 391, 435 P.3d 1126 (2019).

16

We limit our analysis here to the question of whether, under the uncontested facts of this case, the requested instruction was factually appropriate. Generally, a defendant is entitled to instructions on the law applicable to his or her defense theory if the evidence suffices for a rational factfinder to find for the defendant on that theory. If that defendant requests an instruction at trial, the court must view the evidence in the light most favorable to the defendant. This court examines jury instructions as a whole, without focusing on any single instruction, to determine whether they properly and fairly state the applicable law or whether it is reasonable to conclude that they could have misled the jury. *Murrin*, 309 Kan. at 391-92.

It is counterintuitive to posit that an individual can be so drunk that he or she is incapable of engaging in reckless conduct. The statutory definition of reckless second-degree murder involves a killing committed "unintentionally but recklessly *under circumstances manifesting extreme indifference to the value of human life*." (Emphasis added.) K.S.A. 2018 Supp. 21-5403(a)(2). The qualifying words suggest an objective element of the crime: the circumstances show whether the behavior was reckless. If the circumstances manifest extreme indifference to the value of human life, the offense was committed recklessly.

The uncontested evidence showed that Claerhout got into his truck, started it, drove down a roadway, decided to accelerate to 90 miles per hour, conversed with the two passengers, stopped his truck when he realized that he had hit something, and lit and smoked cigarettes when interviewed by police. We conclude that the mental capability to engage in and carry out those activities demonstrated the minimal sufficient mental capacity to engage in reckless conduct. Had he been so extremely intoxicated that he lost the capacity to consciously disregard a risk of harming others, he also would have lost the capacity to consciously operate a vehicle in this fashion and converse with others.

17

In *Murrin*, this court quoted from LaFave on Substantive Criminal Law. 309 Kan. at 394. LaFave suggests that the degree of consciousness required for recklessness is quite low, perhaps even as low as the degree of consciousness required to put a key in a truck's ignition:

> "'Recklessness' in causing a result exists when one is aware that his conduct might cause the result, though it is not substantially certain to happen. One may act recklessly if he drives fast through a thickly settled district though his chances of hitting anyone are far less than 90%, or even 50%. Indeed, if there is no social utility in doing what he is doing, one might be reckless though the chances of harm are something less than 1%. Thus, while 'knowledge' and the knowing-type of 'intention' require a consciousness of almost-certainly, recklessness requires a consciousness of something far less than certainty or even probability." 1 LaFave, Substantive Criminal Law §5.4(f) (3d ed. 2018).

Another treatise explains that courts have historically declined to give a voluntary intoxication instruction for crimes based on recklessness:

> "The mental state of 'recklessness' ordinarily requires that the defendant be aware of and disregard a substantial risk that a particular harm will occur. If the crime charged requires recklessness, intoxication is ordinarily not a defense. The intoxication may be so extreme as to prevent the defendant from being aware of the pertinent risk. Nevertheless, it is commonly provided that if the defendant, as a result of voluntary intoxication, is unaware of a risk of which he would have been aware had he been sober, such unawareness is immaterial. The supportive theory is that there is enough 'recklessness' involved in voluntarily becoming grossly intoxicated—given the general understanding in our culture that extreme intoxication lessens inhibitions, provides an outlet for aggressive tendencies, and blunts perception and judgment—to warrant criminal liability." 2 Wharton's Criminal Law §111 (15th ed. 2019).

18

Consistent with Wharton's view, courts have allowed the prosecution to introduce evidence of voluntary intoxication to *prove* recklessness, which is the contrary of Claerhout's position that intoxication should be considered a *defense* to recklessness. *State v. Jones*, 283 Kan. 186, 209, 151 P.3d 22 (2007) (evidence of voluntary intoxication alone is not enough to warrant instruction on reckless second-degree murder), *disapproved on other grounds by State v. Nelson*, 291 Kan. 475, 243 P.3d 343 (2010); *State v. Drennan*, 278 Kan. 704, 715, 101 P.3d 1218 (2004) (intoxication can eliminate intent to kill but may not supply by itself extreme recklessness element of unintentional second-degree murder); see also *People v. Miller*, 75 Ill. App. 3d 775, 777-78, 394 N.E.2d 783 (1979) (evidence of intoxication is admissible to prove recklessness in prosecution for reckless homicide); *Commonwealth v. Cobb*, 399 Mass. 191, 503 N.E.2d 945 (1987) (reduction of conviction to manslaughter not abuse of discretion when evidence suffice to support finding that, due to intoxication, defendant acted in reckless fashion); *People v. Colonna*, 147 A.D.2d 582, 537 N.Y.S.2d 877 (1989) (defendant contended he could not have acted recklessly in killing victim; court disagreed, holding voluntary intoxication does not negate element of recklessness necessary to sustain conviction of second-degree manslaughter); *People v. Vasquez*, 104 A.D.2d 429, 478 N.Y.S.2d 947 (1984) (evidence that defendant was drunk during incident would have supported finding that defendant acted recklessly and not intentionally; trial court should have instructed on lesser included offense of reckless manslaughter).

The common thread in all of these cases is that evidence of intoxication was treated by the courts as evidence of recklessness. We disagree with Claerhout's theory that evidence of his intoxication tends to show he could not attain a reckless state of mind because of his impaired mental function.

19

Because we determine that the requested voluntary intoxication instruction was not factually appropriate, we need not determine whether it could have been legally appropriate. The district court did not err in refusing the requested instruction.

We conclude that no error infected the district court rulings on the three issues that Claerhout raised in his petition for review. We affirm the judgments of the Court of Appeals and the district court.

PATRICK J. MCANANY, Senior Judge, assigned.[1]

_____

[1]**REPORTER'S NOTE:**  Senior Judge McAnany was appointed to hear case No. 115,227 under the authority vested in the Supreme Court by K.S.A. 20-2616 to fill the vacancy on the court created by the retirement of Justice Johnson.