NOT DESIGNATED FOR PUBLICATION

No. 123,328

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DUSTIN EUGENE ABRAMS,
*Appellant*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; JASON GEIER, judge. Opinion filed September 30, 2022. Affirmed.

*Ryan J. Eddinger*, of Kansas Appellate Defender Office, for appellant.

*Natalie Chalmers*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before ISHERWOOD, P.J., GREEN and BRUNS, JJ.

PER CURIAM: Dustin Abrams perpetrated unlawful sex acts against M.B. and a jury convicted him of two counts of aggravated indecent liberties with a child as a result. At trial, by operation of K.S.A. 2019 Supp. 60-455(d), the State presented testimony from R.E., a teenager who babysat M.B. and lived in the same neighborhood. Though R.E. testified at a pretrial motion hearing, she was not available to testify at trial, so the State was reduced to reading her pretrial testimony to the jury. On appeal, Abrams contends the district court committed three errors that entitle him to reversal of his convictions and a new trial. First, the district court erred in finding R.E.'s testimony admissible under K.S.A. 2019 Supp. 60-455(d). As a result, it should not have permitted a prosecutor to

1

read R.E.'s testimony to the jury. Finally, it erroneously declared R.E. unavailable. Following a thorough review of the issues presented we do not share Abrams' opinion that error occurred. Thus, the decisions of the district court and Abrams' convictions are affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

M.B. was born in 2004, and sometime after 2008, her mother, T.B., began dating Dustin Abrams. In May 2010, Kansas Social and Rehabilitation Services (SRS) launched an investigation into T.B.'s household concerning a report of physical neglect, food scarcity, and allegations that Abrams sexually abused five-year-old M.B. Stephanie Griffin interviewed M.B. at home with T.B. present. M.B. told Griffin that her father, J.B., molested her but Abrams did not. M.B. shared that she told her grandmother, J.B.'s mother, about the sexual abuse but her grandmother simply asked whether Abrams was actually the assailant. At the end of the interview, M.B. assured Griffin that she felt safe with Abrams and T.B. No follow-up forensic interview was conducted because the alleged abuser, J.B., was already incarcerated for unrelated offenses.

A year or two later, T.B. moved the family to a different unit in the neighborhood. At the time of the move T.B. and Abrams were no longer dating, however, they reconciled a few weeks later and Abrams moved in soon after.

Shortly after moving in with T.B., Abrams developed a friendship with Jacob Keeler, a neighbor, and longtime friend of T.B.'s. Keeler distanced himself from Abrams in rather short order, however, after exposure to behavior from Abrams that Keeler found remarkably unsettling. Specifically, Abrams made sexual comments about M.B., would tell Keeler that he needed to step out of the room to sexually assault the child, and describing the act he intended to perform in an extraordinarily repugnant way. Abrams also remarked how he eagerly awaited subjecting M.B. to specific sex acts and

complimented the way she provided oral sex. Abrams made the comments on multiple occasions, including in M.B.'s presence at times.

Keeler also observed Abrams grope M.B.'s groin, put his hands down her pants, remove her pants and molest her bottom, and push the child to her knees to simulate her providing oral sex. Abrams threatened to hurt M.B. if she told anyone about the abuse. T.B. also witnessed Abrams fondle M.B.'s chest and groin more than once and also observed him pull her pants down and fondle her bottom. T.B. claimed to be too fearful of Abrams to intervene, yet also told Keeler, several times, of her desire to get Abrams and M.B. a hotel room when M.B. turned 16 so Abrams could introduce her to sex. Abrams also felt confident and secure enough in his behavior and friendship with Keeler to send Keeler sexually explicit photos of M.B., as well as of her babysitter, R.E., and boldly sent exceptionally lurid text messages about M.B. to Keeler.

It was around this time that T.B.'s neighbors, the Funks, took M.B.'s brother, B.B., to the fall festival at Perry, Kansas. M.B. called Crystal Funk while they were at the festival and asked Funk to come pick her up because Abrams forced her face into his crotch and she did not feel safe with him. The Funks and B.B. immediately returned home and found M.B. crying on her porch. She disclosed to Funk that Abrams repeatedly sexually assaulted her, but she was too scared to contact the police. Funk took the initiative to call in an anonymous report of sexual abuse.

Meanwhile, Keeler shared one of Abrams' more graphic texts about M.B. with the husband of M.B.'s cousin, Antonia Newman, who then passed it along to Antonia. Antonia promptly notified police. Her complaint, in tandem with Funk's anonymous report, prompted law enforcement to begin to investigate Abrams around November 2015.

Officers interviewed Abrams on November 24, 2015, and he denied all allegations of sexual abuse. He admitted to pinching M.B. on her underarm but denied ever touching her breasts or removing her pants and fondling her bottom. As for the explicit text message that Keeler turned over to police, Abrams claimed it was about a woman from work. During the same interview, Abrams conceded that he once woke up to R.E. in his bed, but he told her to get out. He also told officers that R.E. once texted him a picture of her breasts, but he deleted it and told her to stop such behavior.

Following Abrams' interview, officers executed a search warrant at his residence, interviewed T.B., B.B., and R.E., then ultimately removed all the children from the home. Even though numerous cell phones and electronic devices were seized during the search, all were returned to Abrams without downloading their contents.

M.B. was immediately placed into a foster home. While there, she participated in two separate forensic interviews with Lameka Jones, a child protection specialist with the Kansas Department of Children and Families. The first interview took place nearly commensurate with M.B.'s removal from the home. She was very unsettled during that meeting and while she voiced fear of Abrams, she did not disclose any details of the abuse she endured because of Abrams' threats to cause her harm if she ever told anyone. The second interview occurred the following month. During that discussion, Jones asked M.B. where Abrams touched her and M.B. simply pointed to the word "vagina" written on a whiteboard. M.B. felt a tad less apprehensive during the second interview, but still did not divulge the extent of Abrams' abuse.

In early 2016, M.B., B.B., and N.B. moved in with the Newmans. Soon after, M.B. began to see Emily Mills, a mental health therapist who specialized in treatment for sexual abuse. An intense sense of shame initially prevented M.B. from opening up to Mills but, after an extensive time period, M.B. gradually disclosed details of the abuse she suffered, including that Abrams had sex with her and that her mother, T.B., was

4

sometimes present during the assaults. She never accused anyone other than Abrams of the abuse. Though Abrams was arrested in 2015, he was not immediately charged and T.B. maintained a "friends with benefits" relationship with him. She eventually relinquished her parental rights in 2018.

In 2019, the State finally charged Abrams with two counts of aggravated indecent liberties with a child. Prior to trial, the State filed a motion pursuant to K.S.A. 2019 Supp. 60-455(d), seeking to introduce evidence that Abrams also sexually assaulted R.E., a young girl who frequently babysat M.B. The court conducted a hearing on the State's motion at which R.E. testified and corroborated details M.B. previously disclosed about an evening when Abrams provided both girls with alcohol and had sex with them. R.E. also testified that she saw Abrams sexually assault M.B. in various ways on several occasions. At the end of the hearing the court granted the State's request to admit evidence of the acts perpetrated against R.E.

On the day of trial when testimony was scheduled to begin, the State announced it was attempting to locate R.E. but, as of yet, its efforts failed. The next day, the court held a hearing outside the presence of the jury to determine whether R.E. was unavailable pursuant to K.S.A. 60-459(g). After hearing witness testimony and arguments from the parties, the district court declared R.E. an unavailable witness. The parties then addressed the proper method of publishing R.E.'s prior testimony to the jury. The State suggested that a prosecutor not involved with the case take the witness stand in R.E.'s stead and, along with the trial's prosecutor, read aloud the questions and answers that provided the substance of R.E.'s earlier testimony. Abrams recommended either providing the jury with hard copies of the transcript from R.E.'s testimony or having a computer program read the transcript aloud. The court briefly took the matter under advisement but ultimately granted the State the latitude to offer R.E.'s testimony through a reading of the transcript by two prosecutors.

5

Abrams' trial got underway and multiple witnesses were called by the State to testify about the abuse M.B. suffered. First, T.B. explained that she observed Abrams grope M.B.'s chest and groin several different times. She also testified that she witnessed Abrams remove M.B.'s pants and underwear then separate the cheeks of her bottom. T.B. claimed she asked Abrams to stop, but he refused and she was too afraid of him to force the issue. According to T.B., Abrams told her that he assaulted M.B. because T.B. was unfaithful and so if she did not want to be with him then he would use her daughter instead.

M.B. testified and told the jury that the number of times Abrams touched her at their home was too high to count. She corroborated T.B.'s assertions that Abrams removed her pants and spread the cheeks of her bottom apart. She also explained that Abrams touched and put his mouth on her naked breasts, and even in front of T.B. on occasion. Finally, she testified that Abrams had sex with her multiple times. She told the jury that her mother was present during a few episodes of intercourse and that one time, Abrams provided her and her babysitter, 14-year-old R.E., moonshine and then had sex with them both.

Abrams opted not to testify. In closing, his counsel argued that the State "lost evidence" and highlighted the report from 2010 that alleged M.B.'s father, J.B., molested her. The jury returned a guilty verdict for both charges. The district court imposed a sentence of life without the possibility of parole for 25 years on both counts and ordered the sentences to be served consecutively.

Abrams timely appealed.

*The District Court Properly Granted the State's Motion to Introduce R.E.'s Testimony under K.S.A. 2019 Supp. 60-455(d).*

Abrams' first contention of error is that the district court should not have allowed R.E.'s testimony in under K.S.A. 2019 Supp. 60-455(d) because it was neither relevant nor material, and its prejudicial effect outweighed any probative value it carried.

*Standard of Review*

"When the State seeks to introduce evidence of prior bad conduct under K.S.A. 60-455, that evidence must be material, and its probative value must outweigh its potential for producing undue prejudice. *State v. Gunby*, 282 Kan. 39, 48, 144 P.3d 647 (2006). Whether such evidence is material—meaning that the evidence has some real bearing on the decision in the case—is reviewed independently, without deference to the district court. Whether the evidence is relevant to prove a disputed material fact is reviewed only for abuse of discretion. Whether the probative value of the evidence outweighs the potential for undue prejudice against the defendant is also reviewed only for abuse of discretion. *State v. Haygood*, 308 Kan. 1387, 1392-93, 430 P.3d 11 (2018)." *State v. Claerhout*, 310 Kan. 924, 927-28, 453 P.3d 855 (2019).

*Preservation*

This court has unlimited review over whether an issue is properly before us on appeal. *State v. Haberlein*, 296 Kan. 195, 203, 290 P.3d 640 (2012). "Generally, to preserve an evidentiary issue for appellate review, the complaining party must have lodged a timely and specific objection at trial." *State v. Dupree*, 304 Kan. 43, 62, 371 P.3d 862 (2016) (citing K.S.A. 60-404). The Kansas Supreme Court recently reiterated that evidentiary objections must be both timely and specific in order "to give the district court 'the opportunity to conduct the trial without using . . . tainted evidence, and thus

7

avoid possible reversal and a new trial.' *Baker v. State*, 204 Kan. 607, 611, 464 P.2d 212 (1970)." *State v. Alfaro-Valleda*, 314 Kan. 526, 532-33, 502 P.3d 66 (2022).

The State argues this issue is not preserved and therefore not properly before us for review. It first notes that Abrams failed to cite where he entered a contemporaneous objection to the admission of the evidence at trial. Abrams counters that the preservation burden was satisfied at two different points: First when trial counsel objected to the trial court's ruling admitting R.E.'s testimony under K.S.A. 2019 Supp. 60-455 following the pretrial motion hearing, and again when he renewed his objection at trial.

We agree with the State that Abrams did not fulfill his burden to properly preserve this issue. To begin with, the first objection cited by Abrams, that which was entered during the pretrial hearing, is not sufficient to preserve the issue for appeal. See *State v. Ballou*, 310 Kan. 591, 612-14, 448 P.3d 479 (2019) (a pretrial objection to K.S.A. 2019 Supp. 60-455 evidence cannot meet the requirements outlined in K.S.A. 60-404). A panel of this court also explained that "a pretrial ruling is subject to change at trial as the case unfolds. As a result of the fluid nature of a trial, a district court should be given the chance to make a final ruling after hearing additional arguments and considering evidence." *State v. Stewart*, No. 120,655, 2020 WL 1074710, at *3 (citing *Ballou*, 310 Kan. at 613) (Kan. App. 2020) (unpublished opinion); see also *State v. Toothman*, No. 115,716, 2017 WL 5016206, at *4 (Kan. App. 2017) (unpublished opinion) (a pretrial objection standing alone does not constitute a contemporaneous objection for purposes of K.S.A. 60-404).

Abrams' reliance on the second objection, that which he claims renewed his earlier objection, is flawed in two respects. First, counsel did not enter that objection until after the prosecutors completed their recitation of R.E.'s testimony from the transcript. Objections voiced after the complained of evidence is already admitted are not timely under K.S.A. 60-404. *State v. Hilt*, 299 Kan. 176, 192, 322 P.3d 367 (2014). Abrams

8

therefore did not sustain his burden to *timely* object to the district court's admission of the K.S.A. 2019 Supp. 60-455(d) evidence. Further, the foundation for that objection was that when reading R.E.'s responses, the prosecutor added or changed words. Thus, it was grounded in *how* the prosecutor read the transcript, not that the evidence was fundamentally inadmissible. Accordingly, Abrams also failed to fulfill his obligation to enter a *specific* objection to the admission of the K.S.A. 2019 Supp. 60-455(d) evidence. See *State v. George*, 311 Kan. 693, 700-01, 466 P.3d 469 (2020) ("Moreover, it is not sufficient for a defendant to object on one ground and argue another ground on appeal.").

The statutory requirements for preservation and longstanding caselaw interpreting the same are clear—to secure appellate review, a litigant must offer an objection that is both timely and specific. Abrams' failure to meet these requirements forecloses consideration of his claim. He does not offer any argument or explanation for why the issue should be analyzed despite its procedural deficiencies. Accordingly, we decline to examine its merits. The district court did not err when it granted the State's motion to introduce R.E.'s statements into evidence through K.S.A. 2019 Supp. 60-455(d).

*The District Court Properly Exercised Its Discretion when it Allowed the State to Read R.E.'s Prior Testimony into Evidence After the Court Determined she was an Unavailable Witness.*

In his second contention of error, Abrams argues that the district erred by allowing two prosecutors to read R.E.'s prior testimony into evidence after the court determined she was unavailable.

K.S.A 2019 Supp. 60-460(c) provides that, if a witness is unavailable, his or her prior testimony may be published to the jury. After finding that R.E. was unavailable under K.S.A. 60-459(g), the question then became the appropriate method of publication. The trial prosecutor proposed that he read the questions posed during R.E.'s previous testimony while a prosecutor not actively involved in Abrams' case take the stand as a

proxy for R.E. and read the answers R.E. provided at that time. Abrams recommended that the court provide each juror with a hard copy of R.E.'s testimony or, alternatively, utilize a computer program to have the transcript read aloud. The district court adopted the method proposed by the State and, before publication, explained to the jury that the individual reading for R.E. was an employee of the District Attorney's office.

*Preservation*

Abrams objected to the court allowing another prosecutor to read R.E.'s prior testimony to the jury, therefore, this issue is properly preserved. See K.S.A. 60-404 (requiring a timely and specific objection to preserve evidentiary issues for appellate review); *State v. Dukes*, 290 Kan. 485, 487-489, 231 P.3d 558 (2010) (providing overview of K.S.A. 60-404 and the contemporaneous objection rule).

*Standard of Review*

The parties disagree about the appropriate standard of review. The State suggests that this court should review the district court's ruling consistent with the methodology employed for admissibility questions, i.e., for an abuse of discretion. As authority, the State directs us to *State v. Davis*, 284 Kan. 728, 736, 163 P.3d 1224 (2007), a case that both parties recognize involved a similar issue. In *Davis*, the Kansas Supreme Court noted that the appellant did not provide a standard of review. The court considered viewing the issue as a constitutional one because the appellant framed the issue as creating an unfair trial. Yet it also noted that the appellant conceded that there was no due process violation and failed to make an argument grounded in the Confrontation Clause.

Abrams asserts that we should review the issue de novo because it raises a constitutional question. Specifically, he contends the testimony's presentation "eroded the adversarial process in favor of the State and denied . . . his right to effective assistance of

counsel." Thus it involves only a question of law, arising on proven or stipulated facts, that is determinative of the case, and may therefore be considered for the first time on appeal.

Abrams' argument that the prosecutor reading R.E.'s testimony undermined the adversarial system is keyed to his right to a fair trial. But Abrams, like Davis, provides no legal or factual support for his contention that he faced an unfair trial. Moreover, Abrams' characterization of this issue as a question of law on stipulated facts reflects the rule outlining the three situations when this court may agree to analyze a constitutional argument for the first time. See *State v. Johnson*, 309 Kan. 992, 995, 441 P.3d 1036 (2019). But that rule does not inform our standard of review. We will follow *Davis'* lead and review the district court's decision about the manner of introduction for R.E.'s recorded testimony for an abuse of discretion. See *State v. Rodriguez*, 305 Kan. 1139, 1144, 390 P.3d 903 (2017) (holding this court is duty bound to follow Kansas Supreme Court precedent unless there is some indication that the Kansas Supreme Court is departing from its previous position).

*Analysis*

As noted above, Davis involved a nearly identical issue. *Davis*. In that case, Davis' accomplice testified against him at Davis' preliminary hearing, but invoked the Fifth Amendment at the trial that followed. The district court declared the accomplice unavailable and presented the accomplice's testimony in the same manner R.E.'s testimony was presented here. On review, our Supreme Court declined to assign error to the occurrence. 284 Kan. at 736.

Abrams tries to draw a distinction between his case and *Davis* by highlighting that the testimony in *Davis* was from an accomplice, whereas the testimony at issue in this case was used to bolster the idea that Abrams has the propensity to sexually assault

11

children. In essence he argues that the emotional response that R.E.'s testimony carried the potential to elicit warrants a heightened degree of scrutiny of the issue.

We are not persuaded. First, we glean nothing from *Davis* which tends to suggest its holding is restricted to the type of witness or nature of the testimony published. Further, while the content of R.E.'s testimony may draw a certain sentiment, the prosecutor reading those responses was specifically admonished to read the answers with only a flat affect and verbatim with no additions, inflection, or anything of like manner.

Abrams essentially argues that one of the risks associated with this manner of presentation of the evidence actually came to pass. He focuses our attention on the objection he entered at trial that was attached to the prosecutor's purported failure to follow the transcript verbatim. According to Abrams, this illustrates that the route chosen by the court did not offer the most neutral approach. Our ability to place any appreciable weight on this argument though is compromised by the absence of the transcript from the record. Thus, there is nothing before us that verifies Abrams' assertion. To the contrary, what the record does contain is a discussion in the wake of Abrams' objection during which the State argued that their recitation of the testimony did not contain any substantive alterations and the district court agreed.

Next, Abrams argues that his right to effective representation was eroded when the prosecutor read the transcript because the State's bias would inevitably be expressed by the prosecutors' presentation of R.E.'s prior testimony. Once again, Abrams did not provide a record to show how any alleged adjustments to R.E.'s prior testimony was prejudicial in his case. Because he cannot show prejudice unique to the instant facts, he appears to be arguing that, in general allowing a prosecutor to read prior testimony tilts the balance impermissibly in favor of the State, thereby eroding the adversarial process and undermining his right to effective assistance of counsel. The only authority he cites to support this argument is *Chamberlain v. State*, 236 Kan. 650, 694 P.2d 468 (1985). In

Chamberlain, the Kansas Supreme Court discussed ineffective assistance of counsel claims and explained, referencing *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), that "the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." 236 Kan. at 656. But *Chamberlain* was related to defense counsel's conduct rather than the conduct of the State, which is the angle Abrams argues. Nor does Abrams cite to any case which stands for the proposition that the act of a prosecutor reading prior testimony casts doubt on whether a trial produced a just result. Rather, *Davis* appears to stand for the opposite proposition.

Abrams reiterates the argument he made to the district court, that simply providing the jury with a hard copy of the transcript would yield an ideal result. The same proposition was advanced in *Davis* and the Supreme Court still found that allowing a prosecutor to read the prior testimony was permissible. *Davis*, 284 Kan. at 736.

Abrams seeks to bolster his argument by analogizing to situations in which a testifying detective sits at the prosecutor's table during trial. Abrams cites *State v. Sampson*, 297 Kan. 288, 296-297, 301 P.3d 276 (2013), where the Kansas Supreme Court explained that having a detective sit at the prosecution's table improperly bolstered the credibility of the detective's testimony. But the situations lack the analogous quality Abrams attempts to assign them. The prosecutor here was not personally testifying, and the court took measures to ensure that fact was abundantly clear for the jury. That is, it introduced who planned to read R.E.'s responses and explained that she was not involved in the case and her role was simply to read the "testimony of a witness taken under oath at another time and place and it is to be weighed by the same standards as other testimony." With these statements, the court properly inoculated the jury from any erosion of the adversarial process.

13

Finally, Abrams argues that the State impermissibly commented on witness testimony when the prosecutor, referencing R.E.'s testimony in closing argument, remarked that "this evidence directly shows that the sexual molestation the State accuses the defendant of regarding [M.B.] actually happened." In so asserting, Abrams seemingly intimates, but does not thoroughly brief, that the State impermissibly commented on or otherwise sought to bolster R.E.'s credibility. Yet merely highlighting the spectre of an error falls short of what is needed to avoid waiver and secure appellate review. See *State v. Gallegos*, 313 Kan. 262, 277, 485 P.3d 622 (2021) (issues not adequately briefed are deemed waived or abandoned). Thus, any issue about impermissible comments directed at a witness' credibility is not before us.

*Harmlessness*

Abrams argues that since his right to effective assistance of counsel is implicated, the harmless error analysis is inapplicable. While this is a correct recitation of the law, it is one that is not implicated here.

Abrams goes on to offer the alternative argument that the error cannot be found harmless because the State embellished R.E.'s testimony and improperly bolstered the same by presenting it through two prosecutors. But again, he has failed to provide us with any evidence that substantive distortions were committed. But even so, the district court clearly instructed the jury that the actual testimony was R.E.'s alone and should be viewed through the same lens as any other witness. The State reiterated this sentiment during closing argument by noting that the jury should judge R.E.'s testimony "by the same standards as any other." Finally, the State presented a great deal of evidence which offered the jury a path toward guilty verdicts even without R.E.'s testimony. Thus, there is no reasonable probability that the fact a prosecutor read R.E.'s testimony affected the trial's outcome. Any error attached to this issue was harmless at best.

*The District Court Properly Exercised its Discretion when it Designated R.E. as an Unavailable Witness.*

In his final claim of error, Abrams contends the district court abused its discretion when it found R.E. was unavailable under K.S.A. 60-459(g).

*Standard of Review*

This court reviews a district court's ruling on witness unavailability for an abuse of discretion. *State v. Flournoy*, 272 Kan. 784, 799, 36 P.3d 273 (2001). "An abuse of discretion occurs if: (1) no reasonable person would take the view adopted by the district court; (2) the decision is based on an error of law; or (3) the decision is based on an error of fact." *State v. Ballou*, 310 Kan. at 615.

*Analysis*

K.S.A. 60-459(g) defines "unavailable as a witness" as including

"situations where the witness is (1) exempted on the ground of privilege from testifying concerning the matter to which his or her statement is relevant, or (2) disqualified from testifying to the matter, or (3) unable to be present or to testify at the hearing because of death or then existing physical or mental illness, or (4) absent beyond the jurisdiction of the court to compel appearance by its process, or (5) absent from the place of hearing because the proponent of his or her statement does not know and with diligence has been unable to ascertain his or her whereabouts."

On the day witness testimony was scheduled to begin, the State informed Abrams and the court that R.E. was on the lam and they were actively attempting to determine her whereabouts. After an unsuccessful search, the court held a hearing the following day, outside the presence of the jury, to determine whether R.E. was unavailable under K.S.A.

15

60-459 (g). The State presented multiple witnesses in support of its contention that R.E. was unavailable.

Brenda Albright, an employee of the Shawnee County District Attorney's Office, testified first. She explained that she made reservations for R.E. at a local hotel for February 8th through February 13th. Calls to the hotel on Saturday the 8th and Sunday the 9th, revealed that R.E. failed to check in. A follow up call on Monday yielded the same result along with the added fact that R.E. took the affirmative step to cancel the reservation.

Karen Rangel, another employee from the District Attorney's Office, also testified. Rangel informed the court that she and the prosecuting attorney met with R.E. a week before trial and, at that time, R.E. was cooperative, agreed to testify at trial, and understood the State would provide hotel accommodations. Rangel explained she spoke to R.E. again in the days following that meeting and asked her to arrive at the courthouse by 8:30 a.m. on February 11th. According to Rangel, R.E. arrived around 9 a.m. that morning and chatted with the Funks while she waited. At some point, R.E. complained to Rangel of a toothache, but Rangel told her she could not leave until she was dismissed. R.E. ignored the directive and disappeared at roughly 11:30.

Rangel immediately notified the prosecutor who promptly informed Abrams and the court. Rangel then called, texted, and left messages with the phone number R.E. had provided but R.E. never responded. She also contacted the hotel but that also proved fruitless. Rangel inquired of the other witnesses, but they also had no information related to R.E.'s whereabouts. Later that afternoon, Rangel helped prepare a material witness warrant.

Dennis Gonzales, a senior investigator with the District Attorney's Office, testified that he tried to locate R.E. at her hotel on the day of her disappearance but was

16

unsuccessful. He also called her and left messages, but she never returned his call. Gonzalez also testified that he tried to locate any relative R.E. might have in town but that likewise proved a dead-end. During cross-examination, Gonzalez conceded that he did not contact the phone company and attempt to ping R.E.'s phone.

Detective Charles Wilson also testified and explained that he directed Sergeant Hanika to attempt to serve the material witness warrant on R.E. at the address they had for her mother. Before that order, Hanika was actively searching for R.E. at various hotels, assisted in part by Detective Dunderdale until Dunderdale was pulled off to assist with an unrelated matter.

Abrams did not present any witnesses. Following review of the evidence and arguments of the parties, the court found that the State "exercised reasonable due diligence and in good faith attempted to procure [R.E.] and her testimony" and declared R.E. unavailable.

"The standard for determining whether a witness is unavailable is whether there has been a good faith effort to obtain the witness' presence at trial. The question of good faith effort turns on the totality of the facts and circumstances of the case." *Flournoy*, 272 Kan. at 800. A party must show it has exercised due diligence in searching for the witness and present "actual evidence" that it undertook reasonable efforts to find the witness. *State v. Young*, 277 Kan. 588, 598, 87 P.3d 308 (2004) (citing *State v. Rodriguez-Garcia*, 27 Kan. App. 2d 439, 442, 8 P.3d 3 [1999]). The evidence must be "full and convincing." *Young*, 277 Kan. at 598 (citing *State v. Mitchell*, 18 Kan. App. 2d 530, 535, 855 P.2d 989 [1993]).

Abrams contends the State failed to present "full and convincing" evidence that it exercised due diligence to find R.E. In support of his assertion Abrams points to the fact the State did not review the security camera footage from the courthouse to ascertain

17

R.E.'s direction of travel or any vehicles that may have picked her up. While this is an accurate factual statement, the weight it carries is not necessarily gripping because parties need not exhaust every available resource. See *Hardy v. Cross*, 565 U.S. 65, 70, 132 S. Ct. 490, 181 L. Ed. 2d 468 (2011) (while in hindsight, one can always identify additional steps that could have been taken to find a witness, requiring each of these additional steps would undermine the ultimate test of "reasonableness"); *State v. Brown*, No. 113,212, 2016 WL 6910080, at *2 (Kan. App. 2016) (unpublished opinion) ("The State need not exhaust all possible means of finding witnesses. The measure of that effort is one of reasonable diligence.").

Abrams further argues that it is unclear from the evidence whether officers tried to serve the material witness warrant at R.E.'s mother's house because Detective Wilson, when testifying at the hearing, could not specify the name or address of the individual that the officers visited. Abrams is correct that Wilson could not recall the individual's name, but Wilson was not asked on direct or cross-examination to provide the address where the officers attempted to serve the warrant. Even so, Abrams provides no authority that either the name or the exact address must be specified. In a somewhat related vein, Abrams chides the State for neglecting to locate R.E.'s family members or speak with her ex-boyfriend, B.B. But witness testimony from the hearing paints a different picture. Rangel testified that she tried and failed to determine the identity of R.E.'s mother. Additionally, the District Attorney's senior investigator attempted to track down R.E.'s local relatives but was ultimately unsuccessful. As to the ex-boyfriend, the two merely dated for a few weeks during the mid-2010s. There was no reason for the State to believe that B.B. would have unique information about R.E.'s whereabouts. Again, the State was not required to exhaust every conceivable avenue. See *Cross*, 565 U.S. at 70; *Brown*, 2016 WL 6910080, at *2.

Abrams also requests that we keep three particular cases in mind as we analyze his claim. He starts with *State v. Mitchell*, 18 Kan. App. 2d 530. In that case this court

18

reversed a finding that a witness was unavailable even though the witness received and ignored a subpoena, the court issued a material witness warrant and then a bench warrant after the witness absconded from work release. The *Mitchell* court observed "[t]he State did not produce any evidence to indicate what efforts it had made to locate [the witness] other than the fact she was subject to the process described above" and reversed the unavailability finding because the State's process, and the fact that no police officer had seen the witness, failed to reflect that the State exercised reasonable diligence in its search. 18 Kan. App. 2d at 532. But by contrast, in Abrams' case the State issued both a subpoena and a material witness warrant, dispatched investigators and detectives to scour known places for R.E., and attempted to contact her via phone multiple times. Thus, in this case the State exceeded those efforts deemed deficient in *Mitchell*.

Next, Abrams directs us to *State v. Flournoy*, 272 Kan. 784, where the Kansas Supreme Court affirmed the trial court's ruling that a witness was unavailable after hearing testimony from two investigators who recounted their extensive search efforts. 272 Kan. at 802. When the witness's family brought her in for the preliminary hearing, the investigator wrote down information such as where she and her family lived and her place of employment. Around a year later, two investigators sought to find the witness for trial but discovered she had moved, and her mother had died. Further efforts also proved ineffective, including multiple attempts to serve a subpoena, an attempt to reach the witness through her brother, and tracking her down to a home where no one opened the door.

Abrams seemingly cites to *Flourney* as the model to which the investigator's efforts should be compared in this case. But the critical distinction between the two cases is time. In *Flourney*, the witness eluded the State since the preliminary hearing in 1998. Multiple efforts were undertaken to find her before the 1999 trial nearly a year later. Here, R.E. met with the prosecutor on February 4th and conveyed that she intended to testify at trial the next week. She arrived on the morning of trial but left without warning

19

around two hours later. The hearing to address her unavailability took place the following morning, which provided the State less than 24 hours to search. When taking this time-constraint into account, the State acted in a reasonably diligent manner in its search for R.E.

Finally, Abrams highlights *State v. Walker*, 28 Kan. App. 2d 700, 20 P.3d 1269 (2001), and its explanation in the syllabus which, at first blush, seem to suggest that an unavailability finding may only occur after an exhaustive search for the witness that includes the witnesses' residence and place of employment. 28 Kan. App. 2d 700, Syl. ¶ 4, 705-06. Digging a tad deeper into that opinion, however, the *Walker* court also suggested that this was necessary only when the information was available. Here, Rangel testified that the State did not have information about R.E.'s New Mexico residence or anywhere she may be staying in Topeka other than the hotel room they reserved for her. Nothing in the record establishes that the State had any knowledge related to a possible employer for R.E. Even so, R.E.'s employer would likely have been in New Mexico and therefore would have been of little assistance during the less than 24-hour period that the State searched for R.E. in Topeka. Accordingly, the cases Abrams cites do not support his position that the district court erred when it found R.E. unavailable.

Abrams' case bears greater similarity to *State v. Young*, 277 Kan. 588, 87 P.3d 308 (2004), a case cited by the State. In that case, the Kansas Supreme Court affirmed a district court's ruling that a witness was unavailable after the witness showed up to the waiting room prior to taking the stand at trial, but then left for the restroom and failed to return. An investigator attempted to find him by driving to the witness' girlfriend's house and calling the girlfriend's residence. The efforts did not succeed, but the next day the investigator found the witness at his father's house. As the witness and the investigator were walking to the investigator's car, the witness fled on foot and eluded the investigator. The district court found, and the Kansas Supreme Court agreed, that the witness was unavailable. 277 Kan. at 592-93, 598.

20

Similarly, R.E. arrived at the waiting room and then left a fairly short time later. The State, in both cases, had only one day to find the witnesses and present them to the jury. As in *Young*, the district court in Abrams' case likewise did not abuse its discretion in declaring R.E. unavailable. Viewed collectively, the evidence reflects that the State exercised due diligence and undertook reasonable efforts to find R.E. during the compressed timeframe it had available. Thus, the court properly and reasonably concluded that the State undertook a good faith effort to locate R.E.

Affirmed.